## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA and AMERICAN FINANCIAL & AUTOMOTIVE SERVICES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> LANCE FERGUSON, WAYNE MOORE, ROBERT JACKSON, and CAPITAL DEALER SERVICES GROUP, LLC <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. _____ <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## <u>COMPLAINT</u>

Plaintiffs American Bankers Insurance Company of Florida ("ABIC") and American Financial & Automotive Services, Inc. ("AFAS") (collectively, the "Company," "Assurant," or "Plaintiffs") allege as follows in support of their Complaint against Defendants Lance Ferguson ("Ferguson"), Wayne Moore ("Moore"), Robert Jackson ("Jackson"), and Capital Dealer Services Group, LLC ("CDSG") (collectively, the "Defendants" or, together with non-party John Absher, the "CDSG Conspiracy"):

## INTRODUCTION

1.      Plaintiffs are in the business of creating and selling service contracts and reinsurance products to automotive dealers, such as bumper-to-bumper and various other products sold by finance and insurance departments at automotive dealerships.  While Defendant CDSG does not create or market its own reinsurance products, it directly competes with Plaintiffs as a broker and seller of service contracts and reinsurance products to automotive dealerships on behalf of third-party companies, such as National Auto Care ("NAC") and APCO Holdings, Inc. ("APCO").

2.      This is an action by the Company[1] against a conspiracy of former employees and consultants (Ferguson and Moore), and a current Company employee (Jackson), who, along with another former employee and consultant of the Company (John Absher ("Absher")), conspired among themselves and a competing business (CDSG) they own and control to steal the Company's highly confidential information and divert business away from the Company.

3.      Defendants hatched the conspiracy in or around October 2023, and they have continued it through the present.  As detailed below, Ferguson and CDSG worked with and enticed Jackson, Moore, and Absher to breach their restrictive

---

[1] ABIC and AFAS do business under the trade name "Assurant" and are referred to herein collectively as "Plaintiffs," "Assurant," or the "Company."

covenants with the Company by stealing the Company's highly confidential information and money in aid of the conspiracy. The CDSG Conspiracy then used the Company's highly confidential documents and information to divert automotive dealer clients from the Company to CDSG for the financial benefit of members of the CDSG Conspiracy and with the specific intent to harm the Company.

4.      Absher, a former employee of the Company whom the Company engaged as a consultant from March 1, 2023, to March 1, 2024, became upset when the Company did not renew his Consulting Agreement for another year.[2]

5.      Absher represented to the Company that he planned to retire when his consulting agreement ended on March 1, 2024, but the Company later discovered that Absher's representation was subterfuge, as Absher was simultaneously conspiring with Ferguson and CDSG (and, upon information and belief, Moore and Jackson) to steal the Company's highly confidential documents and information for the CDSG Conspiracy's advantage.

6.      On or around February 7, 2024, Ferguson and CDSG created a pseudonymous email account (mailbox3441@gmail.com (the "Gmail Account")) for the purpose of stealing the Company's highly confidential documents and

---

[2] Plaintiffs have filed a separate lawsuit against Absher in this Court (styled *American Bankers Insurance Company of Florida and American Financial & Automotive Services, Inc. v. John Absher*, Civil Action No. 1:24-CV-02930-VMC (the "*Absher* Action")) and will promptly move to consolidate this action with the *Absher* Action.

information while Absher could still request access to such information as a consultant.

7.     On February 7, 2024, Ferguson and CDSG instructed Absher via wire communications to "[s]end everything to this email [the Gmail Account.]"

8.     Between February 7 and February 23, 2024, Absher, through subterfuge and deception committed by phone, email, text message, and other forms of electronic communication, requested and obtained highly confidential Company documents containing sensitive financial information about the Company's dealer clients, as Absher (working on behalf of the CDSG Conspiracy) falsely represented to the Company that he needed the information for meetings with customers of the Company.

9.     Between February 7 and February 23, 2024, instead of using the Company's highly confidential documents and information to further the Company's interests, Absher sent the materials to the Gmail Account created, owned, and operated by Ferguson and CDSG (the "February 2024 Stolen Information").

10.    The February 2024 Stolen Information included more than 70 documents containing highly sensitive financial information that Assurant maintains and develops regarding approximately 29 of the Company's dealer clients and a customer e-mail contact list.  It also contained a highly confidential sales script, which details the Company's sales, pricing, reinsurance, and tax strategies, and

compiles non-public data that relates to the Company's internal strategies, business operations, and dealer integration and training, among other things. At the request and direction of Ferguson and CDSG, Absher sent all the February 2024 Stolen Information from the Northern District of Georgia to the Gmail Account, which Ferguson and CDSG own and operate in Tennessee.

11.    Days later, on February 27, 2024, Ferguson, CDSG, and Absher began using the February 2024 Stolen Information (on behalf of the CDSG Conspiracy) when meeting with Company clients—including several clients based in the Northern District of Georgia, whom Ferguson and Absher visited numerous times at those clients' Georgia locations—to solicit the dealer clients' business away from the Company. Importantly, Absher, Ferguson, and CDSG began soliciting the Company's dealer clients in the Northern District of Georgia and elsewhere on behalf of CDSG *before* Absher's Consulting Agreement and Confidentiality Agreement (as defined below) with Assurant ended, causing Absher to breach those contracts. Further, given that Absher was paid approximately $30,000 per month under his Consulting Agreement, he not only stole highly confidential documents and information from the Company, but also money in the form of compensation he accepted and retained while he stole from and unlawfully competed with the Company.

12.    The CDSG Conspiracy's theft of Company information did not stop

there.

13.    On April 1, 2024, Absher (on behalf of the CDSG Conspiracy) called one of the few Company employees who had access to the Company's highly confidential pricing documents and information, Shari Lester ("Lester"). Lester did not know Absher had left the Company.

14.    Absher lied to Lester, telling her that he was having trouble with his Assurant work email, and he requested that Lester send to his personal e-mail address (jhabsher@outlook.com)—in direct violation of Company policy—certain documents containing the Company's highly confidential master dealer agreements and pricing information for certain of Assurant's dealer clients (the "April 2024 Stolen Information") as soon as possible so he could have it for upcoming client meetings.

15.    After tricking Lester into sending the April 2024 Stolen Information, Absher (on behalf of the CDSG Conspiracy) immediately forwarded the April 2024 Stolen Information to Ferguson and CDSG at the Gmail Account. Absher (on behalf of the CDSG Conspiracy) instructed Ferguson and CDSG to print the information prior to Ferguson's, Absher's, and CDSG's upcoming meetings with the Company's dealer clients.

16.    Ferguson and CDSG printed the April 2024 Stolen Information, which they, along with Absher, used at meetings in Georgia and other states to cause certain

dealer clients to switch their business from the Company to CDSG.

17.     Absher again forwarded this information to another CDSG employee or agent on April 30, 2024, which the CDSG Conspiracy then used to solicit another Company dealer client to switch its business from the Company to CDSG.

18.     The Company has also learned Absher's, Ferguson's, and CDSG's theft of the Company's highly confidential information was broader and more organized than just the use of the Gmail Account and the theft of information in February and April 2024.  That is, Absher, Ferguson, and CDSG also recruited and enlisted Defendants Moore (a Company consultant) and Jackson (a Company employee), to steal additional highly confidential information from the Company with the specific intent of harming its business for the CDSG Conspiracy's benefit.

19.     Jackson was an employee as recently as July 2025 and is currently on a leave of absence.

20.     Jackson acted as the Company's representative for at least five dealer clients in Georgia whose highly confidential Company information the CDSG Conspiracy stole with Jackson's assistance, and some of those dealer clients have since moved their business from the Company to CDSG.

21.     Moore was a Company employee until May 1, 2024, and he continued working for the Company from May 1, 2024, through December 31, 2024, under a Consulting Agreement, defined below, pursuant to which he was paid $27,500 per

month.    Thereafter, Moore remained bound by various covenants within his agreements with the Company, including, for example, non-competition, non-solicitation, and confidentiality covenants, which he violated, as detailed herein.

22.    As early as October 2023 or before, Moore and Absher discussed joining Ferguson at CDSG in competition with the Company.

23.    Despite the non-competition restrictions in each of their Company agreements, Absher and Moore had discussions between October 2023 and March 1, 2024 (while the Company still employed Moore and while the Company had a consulting relationship with Absher) regarding forming and joining CDSG with Ferguson.

24.    As early as June 19, 2024 (during Moore's active consulting period and while he was subject to non-competition, non-solicitation, and business partner restrictions), Moore emailed Absher and Ferguson, stating, "[y]ou should both have a docusign of the operating agreement for [CDSG] in your email. Unless you have any questions or changes, we can execute it and the effective date is July 1st." Upon information and belief, Absher, Ferguson, and Moore signed the CDSG operating agreement in or around June 2024, placing Moore in direct competition with the Company.

25.    On June 24, 2024, only days after Moore sent Absher and Ferguson the CDSG operating agreement, Moore sent a text message to Absher and Ferguson,

claiming that the Company would soon be experiencing a "***blood bath***" in terms of lost customers.

26.     In the same text message exchange, Absher stated to Moore and Ferguson that "***[w]e will [convert] All Assurant Accounts over time.***"

27.     All the while, Moore concealed his actions and involvement in the CDSG Conspiracy from the Company and, upon information and belief, met with Company dealer clients on behalf of CDSG, including dealer clients that were in the process of switching, or would eventually switch, to CDSG.

28.     The CDSG Conspiracy continued taking the Company's highly confidential information with the help of Moore and Jackson after March 1, 2024 (the date Absher's Consulting Agreement with the Company ended) for the CDSG Conspiracy's unlawful gain.

29.     For example, after March 1, 2024, Absher asked Jackson to obtain the Company's highly confidential information regarding multiple dealer clients. Jackson served as the Company's representative for many, if not all, of these Georgia-based dealer clients, including but not limited to Mike Reed Chevrolet, Nesmith Chevrolet, Sunbelt Ford, Lasseter Motors, and Griffin Motors.

30.     On behalf of the CDSG Conspiracy and under the guise of needing the information to further the Company's interests, Jackson requested access to the Company's highly confidential documents and information regarding these dealer

clients, upon information and belief, falsely representing to Company employees that he needed the information to further the Company's interests and respond to dealer requests for information.  Instead, Jackson provided highly confidential information, oftentimes pertaining to the Georgia-based dealer clients for which he was responsible, to Absher and CDSG.  In turn, the CDSG Conspiracy used the information to solicit Company clients, often successfully.

31.    By way of another example, in or around December 2024, during Moore's consulting period with the Company, while he was restricted from competing with the Company or soliciting its dealer clients, upon information and belief, Moore took a cruise with certain of the Company's dealer clients.  Upon information and belief, at or around the time of the cruise, Moore requested and received the Company's highly confidential information pertaining to at least one of those customers, which he, upon information and belief, used to improperly and successfully solicit that customer to switch its business from the Company to CDSG.

32.    The CDSG Conspiracy used the Company's stolen, highly confidential information to mimic, match, undercut, or otherwise tailor its pricing and deal structures to entice dealer clients in the Northern District of Georgia and other locations to discontinue doing business with the Company in favor of CDSG.

33.    At the same time, the CDSG Conspiracy was hiding its identity and deception of Company employees so that it could unfairly compete with the

Company.

34.    For example, on May 2, 2024, in a text message exchange between Jackson and Absher where the two discussed one of the Company's dealer clients in Georgia that switched its business to CDSG, Jackson worried about the dealer representative disclosing the CDSG Conspiracy, stating that he "can't count on [that dealer client representative] to start communicating with Assurant without giving every detail[.]"

35.    Absher (on behalf of CDSG) then instructed the same dealer client's representative as follows: "Please don't mention my or [Jackson's] name to anyone at Assurant if anyone ask [sic]." This was just one step Absher and Jackson took to hide their actions and those of the CDSG Conspiracy from the Company.

36.     Succinctly stated, Defendants conspired to and stole the Company's property, including documents, information, and money through subterfuge, committing the crimes of theft by deception, receipt of stolen property, wire fraud, computer theft, theft of trade secrets, and other predicate acts set forth in O.C.G.A. § 16-14-3.

37.    Defendants (including but not limited to Ferguson, Moore, and Absher as co-owners of CDSG) were at all relevant times acting as agents, owners, or employees of CDSG, a limited liability company organized under the laws of the State of Tennessee for the purpose of committing the above-referenced crimes

11

against the Company in the Northern District of Georgia, among other places. Additionally, and alternatively, Defendants were also members of an association in fact organized for the purpose of committing crimes against the Company—the CDSG Conspiracy—as set forth more fully herein.

38.    Using the Company's stolen, highly confidential documents and information, the CDSG Conspiracy took steps to divert clients from the Company to CDSG, including, for example, matching, mimicking, undercutting, and/or otherwise tailoring pricing and deal structures to entice dealer clients to discontinue doing business with the Company in favor of CDSG. The CDSG Conspiracy also used the Company's internal strategies contained in a highly confidential sales script, which the CDSG Conspiracy stole and admittedly repurposed for its own use to solicit at least one of the Company's dealer clients.

39.    The CDSG Conspiracy used the Company's highly confidential information to divert more than fifteen of the Company's dealer clients, some of which are based in the Northern District of Georgia, away from the Company to CDSG.

40.    The CDSG Conspiracy's conduct has caused the Company significant monetary damages, as well as substantial harm to the Company's business relationships and goodwill (which is ongoing).

41.    Accordingly, the Company brings this action to recover compensatory

damages, punitive damages, exemplary damages, attorneys' fees and costs, among other remedies, against Defendants.

## **PARTIES**

42.    Plaintiff ABIC is a corporation organized under the laws of Florida, with its principal place of business in Florida, located at 701 Waterford Way, Suite 600, Miami, Florida 33126.

43.    Plaintiff AFAS is a corporation organized under the laws of Texas, with its principal place of business in Texas, located at 1790 Hughes Landing Boulevard, Suite 700, The Woodlands, Texas 77380.

44.    Plaintiffs maintain corporate offices in the Northern District of Georgia at 260 Interstate North Circle, SE, Atlanta, Georgia 30339-2210, where the CDSG Conspiracy directed its tortious and criminal acts.

45.    Upon information and belief, Defendant Ferguson is a resident of Knox County, Tennessee, and he may be personally served at 12512 Amberset Drive, Knoxville, Tennessee 37922.  Ferguson, personally and as an owner and agent of CDSG, regularly conducts business in the State of Georgia and in this judicial district.

46.    As a result of Ferguson's independent actions and participation in the CDSG Conspiracy as alleged herein, Defendant Ferguson committed tortious acts in the State of Georgia and within this judicial district.

47.    For example, Ferguson carried Plaintiffs' stolen, highly confidential information across state lines to the Northern District of Georgia, where he used that information to solicit Mountain Valley Motors, located in Blue Ridge, Jasper, and Dalton, Georgia, and Cronic Chrysler Dodge Jeep Ram, Cronic Chevrolet GMC, and Cronic Nissan, located in Griffin, Georgia (all of which are located in the Northern District of Georgia), to switch their business from the Company to CDSG.

48.    Ferguson also received property stolen by Absher in the Northern District of Georgia to solicit Assurant's dealer clients in this judicial district.

49.    Upon information and belief, Defendant Moore is a resident of Iredell County, North Carolina, and he may be personally served at 378 Indian Trail, Mooresville, North Carolina 28117.    Upon information and belief, Moore, personally and as an agent of CDSG, regularly conducts business in the State of Georgia and in this judicial district.

50.    As a result of Moore's independent actions and participation in the CDSG Conspiracy as alleged herein, Moore committed tortious acts in the State of Georgia and within this judicial district.

51.    For example, while he was still performing services for the Company, on or about May 22, 2024, Moore stole the Company's Atlanta Braves baseball tickets and delivered them to Absher in the Northern District of Georgia for Absher's use in, upon information and belief, soliciting the Company's Georgia-based clients

14

on behalf of the CDSG Conspiracy.

52.    Moore also provided stolen, highly confidential Company information to Absher and the CDSG Conspiracy in the Northern District of Georgia for the purpose of wrongfully soliciting Assurant's dealer clients in the State of Georgia, among other places, including, upon information and belief, those in this judicial district.

53.    Upon information and belief, Defendant Jackson is a resident of Pierce County, Georgia, and he may be personally served at 1371 River Landing Way, Blackshear, Georgia 31516.  Jackson resides and regularly conducts business in the State of Georgia, including in this judicial district.

54.    As a result of Jackson's independent actions and participation in the CDSG Conspiracy as alleged herein, Jackson committed tortious acts in the Northern District of Georgia.  For example, Jackson delivered stolen, highly confidential Company information to Absher in this judicial district for the purposes of assisting the CDSG Conspiracy in soliciting the Company's clients.

55.    Defendant Capital Dealer Services Group, LLC is a limited liability company with its principal place of business at 12512 Amberset Drive, Knoxville, Tennessee 37922.  It may be served via its registered agent Lance Ferguson at 12512 Amberset Drive, Knoxville, Tennessee 37922.  Although CDSG is not registered to

do business in the State of Georgia in violation of applicable law,[3] CDSG regularly conducts business in the Northern District of Georgia and throughout the State of Georgia, as evidenced by, among other things, its solicitation of, and business relationships with, various automotive dealer clients throughout the State of Georgia and in this judicial district.

56.    The members of Capital Dealer Services Group, LLC are Absher, Ferguson, and Moore, making CDSG a citizen of Georgia, Tennessee, and North Carolina.

57.    As a result of CDSG's independent actions and participation in the CDSG Conspiracy, as alleged herein, Defendant CDSG committed tortious acts in the State of Georgia and in this judicial district.

58.    For example, CDSG, through Ferguson, carried Plaintiffs' stolen, highly confidential documents and information across state lines to the Northern District of Georgia where he and Absher used that information to solicit Mountain Valley Motors, located in Blue Ridge, Jasper, and Dalton, Georgia, and Cronic Chrysler Dodge Jeep Ram, Cronic Chevrolet GMC, and Cronic Nissan, located in Griffin, Georgia (all of which are located in the Northern District of Georgia), on behalf of the CDSG Conspiracy.

---

[3] Because CDSG has failed to register with the Georgia Secretary of State, its Georgia contracts with automotive dealers may be void or voidable.

59.    CDSG also received property stolen by Absher in the Northern District of Georgia to solicit Assurant's dealer clients in this judicial district.

## JURISDICTION AND VENUE

60.    This Court has subject matter jurisdiction because the amount in controversy exceeds $75,000 (in fact, the amount in controversy is, at a minimum, several million dollars), exclusive of interest and costs, and the parties are citizens of different states (Florida and Texas for the Plaintiffs; and Tennessee, North Carolina, and Georgia for the Defendants).  28 U.S.C. § 1332(a).

61.    Defendants are subject to the personal jurisdiction of this Court because Absher, CDSG, and Jackson are citizens of the State of Georgia and because all members of the CDSG conspiracy who are not citizens of Georgia regularly transact business in the State of Georgia, committed or participated in the tortious acts described herein within the State of Georgia, and committed tortious acts or omissions within the State of Georgia.

62.    Defendants are also subject to the personal jurisdiction of this Court by virtue of their conspiracy to commit crimes and torts against Plaintiffs and inflict other damage and injury upon Plaintiffs in the State of Georgia.  O.C.G.A. § 9-10-91; *Hyperdynamics Corp. v. Southridge Cap. Mgmt., LLC*, 699 S.E.2d 456, 466–67 (Ga. Ct. App. 2010).

63.    Additionally, Ferguson, CDSG, and Moore are subject to the personal

17

jurisdiction of the Court because they committed crimes and torts against the Company in the State of Georgia, and the damage to the Company was suffered in the State of Georgia in the form of, *inter alia*, lost dealer clients, lost highly confidential information, lost revenue, and lost profits. O.C.G.A. § 9-10-91.

64.    Venue is proper as to all Defendants in this Court pursuant to 28 U.S.C. § 1391(b)(2) because, as alleged herein, a substantial part of the events or omissions giving rise to the claims occurred within the Northern District of Georgia.

65.    For example, Ferguson and CDSG carried Plaintiffs' stolen, highly confidential information across state lines to the Northern District of Georgia (or, in Absher's case, obtained it within this judicial district) where the CDSG Conspiracy used that information to solicit Mountain Valley Motors, located in Blue Ridge, Jasper, and Dalton, Georgia, and Cronic Chrysler Dodge Jeep Ram, Cronic Chevrolet GMC, and Cronic Nissan, located in Griffin, Georgia (all of which are located within the Northern District of Georgia).

66.    Absher and other members of the CDSG Conspiracy also stole the Company's highly confidential information within the Northern District of Georgia and transmitted it to other members of the CDSG Conspiracy from within this judicial district.

## FACTUAL BACKGROUND

### The Company's Automotive Reinsurance Products and Services

67.    ABIC and AFAS are part of a family of companies that do business under the trade name "Assurant."

68.    The Company offers a variety of products and services to its customers across the United States, including, for example, vehicle service contracts for the automotive industry.

69.    Relevant here, the Company provides vehicle service contracts and related products to new and used car dealerships, which allows the dealers to offer pre-paid maintenance, gap insurance (insurance that pays off a consumer's auto loan if the vehicle is lost, stolen, or totaled), and extended warranty services (covering everything from flat tires to dings and scratches to major body or engine work), among other things, to their customers.

70.    The market for service contracts and related products is highly competitive, and companies like ABIC and AFAS compete fiercely with companies like CDSG for auto dealers' business, from which they derive administrative fees in exchange for assisting dealers with the financial aspects of their business, and training the dealer's finance and insurance personnel to drive revenue through sales of the reinsurance products.

19

71.    The Company derives significant value from its negotiated administrative fees, negotiated financial terms, short-term and long-term reinsurance strategies, product and sales strategies, pricing structures, and financial information regarding its dealer customers, dealer customer lists, and contact information. As a result, the Company maintains all such information privately and treats it as highly confidential, including requiring customers and employees to sign confidentiality agreements. In fact, the Company takes significant efforts to maintain the secrecy of such information. For example, in addition to Company security policies and confidentiality agreements protecting the information, information about the Company's administrative fees and dealer financial information is only available to a handful of employees within Assurant Dealer Services ("ADS"), a division of Assurant through which ABIC and AFAS conduct business.

72.    Further, under the Company's master dealer agreements with its dealer clients, all of the same information listed in the preceding paragraph is designated as confidential and may not be disclosed by the Company or the dealer to competitors.

73.    The limited ADS employees who have access to the Company's administrative fees and dealer financial information maintain the protected information in a password-protected database.

74.     Company sales employees and consultants, like Defendants Ferguson, Moore, Jackson, and Absher, did not and do not have access to this information, except upon request for legitimate business reasons, and employees execute confidentiality agreements requiring them to keep the Company's above-described information confidential.

## Absher's Agreements with the Company

75.     In May 2020, an ABIC affiliate acquired AFAS, Absher's employer at the time.  As a result of the acquisition, ABIC became Absher's employer in January 2021, but Absher continued to perform services on behalf of AFAS, ABIC's affiliate, as an ADS employee.

76.     During his employment with the Company, Absher held the position of Regional Sales Manager of ADS, which required him to sell the Company's reinsurance products directly to its automotive dealer clients in the Southeast.

77.     As a condition of his employment, Absher entered into the Confidentiality Agreement with AFAS in September 2021.  A true and correct copy of the relevant portions of the Confidentiality Agreement cited herein is attached hereto as **Exhibit A**.

78.     The Confidentiality Agreement defines "Confidential Information" as:

An item of information, or a compilation of information, in any form (tangible or intangible), related to the business of Employer that Employer has not made public or authorized public disclosure of, and that is not generally known to the public through proper means.

21

(Ex. A ¶ 1.)

79.    The Confidentiality Agreement provides examples of "Confidential Information," including "[b]usiness plans, strategic initiatives, competitive analysis, sales optimization information, marketing plans, corporate development, and financial forecasts," as well as trade secrets.  (*Id.*)

80.    The Confidentiality Agreement goes on to state:

Employee shall not knowingly reveal, disclose or make known to any person . . . or use for Employee's own or another's account or benefit, any such Confidential Information[.] . . . Employee represents and warrants that Employee will only reveal or disclose such Confidential Information as required by law or as necessary in the performance of Employee's duties on behalf of Employer.  Employee warrants and represents Employee will not use, for Employee's own or another's account or benefit, any such Confidential Information, whether or not developed, devised, or otherwise created in whole or in part by the efforts of Employee.

(*Id.*)

81.    Moreover, the Confidentiality Agreement contains a "Customer Restriction" provision, which states Absher shall not:

directly or through others, working alone or in conjunction with one or more other persons or entities, for compensation or not: (a) solicit, assist in soliciting, facilitate the solicitation of, provide, or offer to provide services to (i) any and all customers of [Plaintiff] as to which [Defendant] had contact, provided services or received Confidential Information about . . . ("Covered Customer") . . . or (b) induce or attempt to induce, on behalf of a Competing Business, any Covered Customer to withdraw, curtail or cancel its business with [Plaintiff] or in any other manner modify or fail to enter into any actual or potential business relationship with [Plaintiff].

(*Id.* ¶ 6.)

82.    The Confidentiality Agreement also contains a "Non-Competition" provision, which states Absher shall not:

> provide services that are the same as or similar in function or purpose to the services Employee provided to Employer during the during the last two (2) years of employment . . . or such other services that are otherwise likely or probable to result in the use or disclosure of Confidential Information to a business whose products and services include products and services offered by Employer . . . (such products and services being "**Competing Products and Services**" and such business being a "**Competing Business**"). . . . and/or (b) own, receive or purchase a financial interest in, make a loan to, or make a monetary gift in support of, any such Competing Business[.]

(*Id.* ¶ 4) (emphasis in original).

83.    CDSG is a Competing Business.  (*See id.*)

84.    The Non-Competition provision bound Absher for the one-year period following the termination of his employment; that is, until March 2, 2024.  (*See id.*)

85.    The Confidentiality Agreement includes an "Attorney's Fees" provision, by which Absher agreed to pay the Company's attorney's fees or costs if a court determines that Absher breached or threatened to breach the Confidentiality Agreement.  (*Id.* ¶ 12.)

86.    All the Company's ADS employees are subject to similar confidentiality agreements, whereby they are bound to keep any confidential business, financial, pricing, and proprietary information of the Company or its

clients (including trade secrets) confidential and to use such information only for the Company's legitimate business purposes.

87.     After investigating a report that Absher made inappropriate and offensive comments during a team meeting and determining Absher was not truthful in his account of events, the Company terminated Absher's employment and engaged Absher in an individual contributor role, as memorialized in a Memorandum of Understanding ("MOU"). A true and correct copy of the MOU is attached hereto as **Exhibit B**.

88.     The MOU states that, as of September 1, 2022, Absher would no longer supervise employees or otherwise hold the ADS Regional Manager position, and as of that date, ABIC would engage Absher in an individual contributor role. (Ex. B ¶¶ 1–4.)

89.     The MOU also provides that Absher's employment with ABIC would terminate on March 1, 2023, at which time Absher could continue providing services to the Company for one year as a consultant, pursuant to the terms of a Consulting Agreement. (*Id.* ¶¶ 1, 5.) A true and correct copy of the Consulting Agreement is attached hereto as **Exhibit C**.

90.     The MOU expressly provides that the Confidentiality Agreement remains in effect and clarifies that "paragraphs 4–7 of the [Confidentiality] Agreement, which have a one-year post employment term, will end at the conclusion

of the consulting relationship on March 1, 2024." (*Id.* ¶ 6.)  The referenced paragraphs include the Customer Restriction and Non-Competition provisions.  (Ex. A ¶¶ 4, 6.)

91.    The Consulting Agreement became effective on March 2, 2023, and remained in effect until March 1, 2024.  (Ex. C ¶ 1.)

92.    The Consulting Agreement defines "Confidential Information" as:

Assurant's and its affiliates' data, information and documentation (whether in tangible or intangible form – including but not limited to Confidential Information memorialized by Consultant), which is valuable to Assurant and its affiliates not generally known to the public or its competitors, including but not limited to: (1) Financial information, including but not limited to earnings, profitability, assets, debts, prices, fee structures, expenses, volumes of purchases or sales, or other financial data, whether relating to Assurant or its affiliates generally, or to particular products, services, geographic areas, or time periods; . . . (3) Marketing or sales information, including but not limited to details about ongoing or proposed marketing or sales plans, programs, or agreements by or on behalf of Assurant or its affiliates; execution of marketing or sales plans; production plans, strategies, reviews, and results; marketing or sales forecasts, strategies, tactics, reviews, analyses, and results; marketing or sales tools, resources, action plans, and models; marketing or sales training programs, strategies, and tactics; lead generation, strategies, schedules, management, and results; marketing- or sales-related analyses; and information about pending or completed transactions; (4) Customer or client and prospective customer and client (whose business Assurant has actively pursued or is actively pursuing (hereinafter "customer" information[))], including sales or service information; pricing models and information for customers; compilations of existing customers; customer needs, preferences, and requirements; customer proposals or agreements; status of customer accounts or credit; customer service quality processes and issues; related information about customers; and such information about potential customers; (5) business plans and strategies, business models, brand development, acquisition-related

information, business partner-related information, product and service plans and development, outsourcing plans and strategies, sales forecasts and strategies, and similar business information[.]

(*Id.* ¶ 6.)

93.    The Consulting Agreement also contains a "Nondisclosure of Trade Secrets and Confidential Information" provision (hereinafter, the "Nondisclosure Provision"), which survives the Consulting Agreement's termination and governs Absher's use and disclosure of confidential information and trade secrets.  (*Id.* ¶ 7.)

94.    Specifically, the Nondisclosure Provision provides:

The parties acknowledge that during the term of this Agreement, Assurant may make available to Consultant certain of its Confidential Information and Trade Secrets to enable Consultant to provide services under this Agreement.  During the term of this Agreement, Consultant agrees to use such Confidential Information and Trade Secrets solely for Assurant's benefit, and that Consultant will not disclose, furnish, transmit, send, or disseminate Confidential Information and Trade Secrets to any person or entity other than those within Assurant authorized to receive such information.  Consultant agrees that it will not, so long as the pertinent information or documentation remain Trade Secrets, otherwise directly or indirectly use, disclose, furnish, transmit, send, or disseminate to any other person, organization, or entity, or otherwise employ, any Trade Secrets.  Consultant further agrees that it will not, during the term of this Agreement and for two (2) years after the termination of this Agreement (whether voluntarily or involuntarily, with or without cause or prior notice), otherwise directly or indirectly use, disclose, furnish, transmit, send, or disseminate to any other person organization or entity, or otherwise employ, any Confidential Information. . . .

Consultant acknowledges that Assurant has received and in the future will receive from third parties their confidential proprietary information and trade secrets subject to a duty on Assurant's part to maintain the confidentiality of such information and to use it only for certain limited

purposes. Consultant agrees to hold all such confidential proprietary information and trade secrets in the strictest confidence and not to disclose it or use it except as necessary to provide services under this Agreement and consistent with Assurant, Inc.'s agreement with such third party.

(*Id.*)

95.     At no point during the term of the MOU or Consulting Agreement did ABIC ever inform Absher or otherwise state that it would extend the terms of the Consulting Agreement or otherwise allow Absher to continue working for ABIC as a consultant after March 1, 2024.

96.     In fact, Absher was aware as early as January 2024 that ABIC would not be renewing the Consulting Agreement, and that the consulting relationship would expire on March 1, 2024.

97.     Absher's last day performing services for the Company was March 1, 2024.

### Defendant Ferguson's Employment and Agreements with the Company

98.     In March 2013, Defendant Ferguson began his employment with AFAS.

99.     In May 2020, ABIC's affiliate acquired AFAS, Ferguson's employer at the time. As a result of the acquisition, ABIC became Ferguson's employer in January 2021, but Ferguson continued to perform services on behalf of AFAS, ABIC's affiliate, as a Company employee.

100.    During his employment with the Company, Ferguson held the position of District Manager of ADS, which required him to sell the Company's reinsurance

products directly to its automotive dealer clients in the Southeastern United States.

101.   As a condition of his employment, Ferguson entered into a Confidentiality Agreement with AFAS in September 2021.  A true and correct copy of the relevant portions of the Confidentiality Agreement cited herein is attached hereto as **Exhibit D**.

102.   The Confidentiality Agreement defines "Confidential Information" as:

[A]n item of information, or a compilation of information, in any form (tangible or intangible), related to the business of Employer that Employer has not made public or authorized public disclosure of, and that is not generally known to the public through proper means.

(Ex. D ¶ 1.)

103.   The Confidentiality Agreement provides examples of "Confidential Information," including "[b]usiness plans, strategic initiatives, competitive analysis, sales optimization information, marketing plans, corporate development, [] financial forecasts . . . supplier and customer information, lists, and data . . . [and t]rade secrets."  (*Id.*)

104.   The Confidentiality Agreement's "Confidentiality Provision" states in pertinent part:

Employee shall not knowingly reveal, disclose or make known to any person . . . or use for Employee's own or another's account or benefit, any such Confidential Information . . . . Employee represents and warrants that Employee will only reveal or disclose such Confidential Information as required by law or as necessary in the performance of Employee's duties on behalf of Employer.  Employee warrants and represents Employee will not use, for Employee's own or another's

28

account or benefit, any such Confidential Information, whether or not developed, devised, or otherwise created in whole or in part by the efforts of Employee.

(*Id.*)

105.   The Confidentiality Agreement includes an "Attorneys' Fees" provision, by which Ferguson agreed to pay the Company's attorneys' fees and costs if a court determines that Ferguson breached or threatened to breach the Confidentiality Agreement.  (*Id.* ¶ 12.)

106.   The Confidentiality Agreement was in effect at the time of the conduct described in this Complaint.

107.   All the Company's ADS employees are subject to similar confidentiality agreements, whereby they are bound to keep any confidential business, financial, pricing, and proprietary information of the Company or its clients confidential and to use such information only for the Company's legitimate business purposes.

108.   On March 31, 2022, Ferguson resigned his employment with the Company.

### Defendant Moore's Employment Agreement with the Company

109.   When an ABIC affiliate acquired AFAS in May 2020, AFAS also employed Moore.  As a result of the acquisition, ABIC became Moore's employer in January 2021, but Moore continued to perform services on behalf of AFAS,

29

ABIC's affiliate, as a Company employee.

110.    Moore was employed as a Divisional Vice President of Sales with responsibility for managing Regional Sales Managers who maintained relationships with the Company's automotive dealer clients, providing strategic leadership within ADS based on specialized knowledge of its clientele and appropriate markets, participating in ADS's growth and increasing its profitability, and performing other high-level functions.

111.    As a condition of his employment, Moore executed a Confidentiality and Non-Competition Agreement ("Confidentiality Agreement") with AFAS, which contains post-employment confidentiality and customer non-solicitation covenants prohibiting him from, among other things, using or disclosing the Company's or its clients' confidential information.  A true and correct copy of the relevant portions of the Confidentiality Agreement cited herein is attached hereto as **Exhibit E**.

112.    The Confidentiality Agreement defines "Confidential Information" as:

> [A]n item of information, or a compilation of information, in any form (tangible or intangible), related to the business of Employer that Employer has not made public or authorized public disclosure of, and that is not generally known to the public through proper means.

(Ex. E ¶ 1.)

113.    The Confidentiality Agreement provides examples of "Confidential Information," including "[b]usiness plans, strategic initiatives, competitive analysis, sales optimization information, marketing plans, corporate development, and

financial forecasts . . . ." (*Id.*)

114.   The Confidentiality Agreement goes on to state:

Employee shall not knowingly reveal, disclose or make known to any person . . . or use for Employee's own or another's account or benefit, any such Confidential Information[.] . . . Employee represents and warrants that Employee will only reveal or disclose such Confidential Information as required by law or as necessary in the performance of Employee's duties on behalf of Employer. Employee warrants and represents Employee will not use, for Employee's own or another's account or benefit, any such Confidential Information, whether or not developed, devised or otherwise created in whole or in part by the efforts of Employee.

(*Id.*)

115.   The Confidentiality Agreement contains a "Non-Competition" provision that lasts for one year after Moore's final day of employment with the Company.  (*Id.* ¶ 4.)

116.   Since Moore's employment with the Company ended on May 1, 2024, the Confidentiality Agreement's Non-Competition provision bound Moore until May 2, 2025.

117.   The Non-Competition provision provides that Moore shall not:

provide services that are the same as or similar in function or purpose to the services Employee provided to Employer during the during the last two (2) years of employment . . . or such other services that are otherwise likely or probable to result in the use or disclosure of Confidential Information to a business whose products and services include products and services offered by Employer . . . (such products and services being "**Competing Products and Services**" and such business being a "**Competing Business**"). . . . and/or (b) own, receive or purchase a financial interest in, make a loan to, or make a monetary

gift in support of, any such Competing Business[.]

(*Id.*) (emphasis in original).

118.   CDSG qualifies as a "Competing Business."  (*See id.*)

119.   The Non-Competition provision restricts the above-described competition within Moore's territory during his final two years of employment with the Company, that is, the Atlantic and Southeastern Regions, including the State of Georgia.  (*See id.*)

120.   Moreover, the Confidentiality Agreement contains a "Customer Restriction" provision that also lasts for one year after Moore's final day of the employment with the Company, which states Moore shall not:

> directly or through others, working alone or in conjunction with one or more other persons or entities, for compensation or not: (a) solicit, assist in soliciting, facilitate the solicitation of, provide, or offer to provide services to (i) any and all customers of Employer as to which Employee had contact, provided services or received Confidential Information about . . . ("Covered Customer") . . . or (b) induce or attempt to induce, on behalf of a Competing Business, any Covered Customer to withdraw, curtail or cancel its business with Employer or in any other manner modify or fail to enter into any actual or potential business relationship with Employer.

(*Id.* ¶ 6.)

121.   Since Moore's employment with the Company ended on May 1, 2024, the Confidentiality Agreement's Non-Competition provision bound Moore until May 2, 2025.

122.   The Confidentiality Agreement includes an "Attorney's Fees"

provision by which Moore agreed to pay the Company's attorneys' fees and costs if a court determines that Moore breached or threatened to breach the Confidentiality Agreement. (*Id.* ¶ 12.)

123. All the Company's ADS employees are subject to similar confidentiality agreements, whereby they are bound to keep any confidential business, financial, pricing, and proprietary information of the Company or its clients confidential and to use such information only for the Company's legitimate business purposes.

### The Company Engages Defendant Moore as a Consultant

124. To assist in the transition resulting from Moore's May 1, 2024 retirement from the Company, on May 2, 2024, ABIC engaged Moore as a consultant through December 31, 2024, via the Consulting and Separation Agreement ("Consulting Agreement"), which also contained confidentiality protections and affirmations that Moore had not then violated his responsibilities to the Company under the Confidentiality Agreement. A true and correct copy of the relevant portions of the Consulting Agreement is attached hereto as **Exhibit F**.

125. The Consulting Agreement makes clear that the Confidentiality Agreement still applies, stating, "[t]he Confidentiality and Non-Competition Agreement between Moore and [AFAS], an Assurant, Inc. affiliate, remains in full force in effect." (Ex. F ¶ 14.)

126.   Further, the Consulting Agreement contains its own "Confidentiality" provision that states in part, "Moore affirms that he has not made an unauthorized disclosure of any proprietary or confidential information, including trade secrets, of Company or any of the Released Parties to any third party." (*Id.* ¶ 9.b.)

127.   The Consulting Agreement contains an attorneys' fees provision by which "Moore agrees to pay all of the Company's costs and expenses (including reasonable attorneys' fees) related to . . . efforts to enforce the terms of this Agreement[.]" (*Id.* ¶ 8.)

### Defendant Jackson's Employment with the Company

128.   Although currently on leave, Jackson works for AFAS as a District Manager and owes a duty of loyalty to the Company.

129.   Jackson's role with the Company requires him to serve as the Company's representative for handling its relationships with many of its Georgia-based dealer clients.   In this role, Jackson has access, through the assistance of Company employees, to the Company's highly confidential documents and information pertaining to those same Georgia-based dealer clients.

### Defendant Ferguson Forms CDSG

130.   During Ferguson's employment with the Company, which ended in March 2022, he worked with Absher, Moore, and Jackson.   Absher and Ferguson

sold the Company's reinsurance products directly to the Company's automotive dealer clients.

131.   By virtue of Absher's and Ferguson's roles and duties for the Company, both had, upon request and only for legitimate business reasons, access to certain highly confidential information of the Company (including, for example, proprietary sales information and highly confidential financial information regarding its dealer clients).

132.   In July 2022, for the purpose of harming the Company and obtaining its highly confidential information by theft, Ferguson formed and began operating CDSG, a limited liability company in the reinsurance business and automotive dealer market that directly competes with the Company.

133.   In July 2022, CDSG began competing with the Company by selling service contracts and related products in competition with the Company, and Ferguson and CDSG began targeting the Company's dealer clients.

**<u>Defendants Conspire with Absher to Steal the Company's Highly Confidential Information</u>**

134.   The Company terminated Absher's employment effective March 1, 2023, due to unrelated misconduct, but it entered into a consulting agreement with him whereby Absher would continue servicing the Company's dealer clients for one year, until March 1, 2024, as a consultant without supervisory authority over any Assurant employees.

135.   During his period working for the Company as a consultant, Absher was contractually prohibited from using, disclosing, sharing, or revealing confidential information of the Company.   These prohibitions survived the termination of Absher's business relationship with the Company on March 1, 2024, and they are still effective and enforceable.

136.   During his period working for the Company as a consultant, Absher was contractually prohibited from competing with the Company in the territory in which he performed services for the Company for a period of one year following the termination of his employment (*i.e.*, through March 1, 2024).

137.   Upon information and belief, and with Absher's consultant relationship with the Company coming to an end in March 2024, in or around October 2023, if not before that date, Ferguson, Absher, Moore, and CDSG began forming a plan to steal the Company's highly confidential information to solicit and induce those clients to terminate their business with the Company in favor of CDSG.

138.   Moore knew or should have known of Ferguson, Absher, and CDSG's conspiratorial efforts, and he was complicit and a participant in their scheme.

139.   Well before Moore's purported May 1, 2024 retirement (he did not retire), he made plans with Absher to join Ferguson as an owner of CDSG and did so, which ultimately occurred well before Moore's Consulting Agreement with the Company ended on December 31, 2024.  As such, Moore breached his Consulting

Agreement with the Company and engaged in direct competition against the Company in violation of his Confidentiality Agreement.

140.  As early as October 2023 (while the Company still employed Moore and Absher), Moore, Absher, and Ferguson discussed going into business together as owners of CDSG.

141.  For instance, on October 13, 2023, Moore emailed Absher, stating, "[l]et's put together a deal with Lance [Ferguson]. I'm ready."

142.  Then, in early 2024, around the same time that Absher learned the Company would not be renewing his Consulting Agreement, Moore set up a Zoom meeting with Absher and Ferguson.  Ferguson was not an employee of the Company at this time, and upon information and belief, Absher, Ferguson, and Moore used this meeting to conspire against the Company and discuss their plans to steal its highly confidential information and divert its dealer clients to CDSG.

143.  On April 4, 2024 (while the Company still employed Moore), Absher sent a text message to Ferguson, stating, "Wayne [Moore] is all in with us just knowing he can participate in some small %.  We will call him together next Thursday [April 11, 2024]."

144.  Upon information and belief, Ferguson and Absher called Moore on behalf of CDSG to discuss the details of Moore's equity participation in CDSG and to further discuss their plans to harm the Company.

145.   On or about June 19, 2024 (while Moore was a consultant for the Company and subject to non-competition obligations to the Company), Moore sent a text message to Absher and Ferguson stating, "[y]ou should both have a docusign of the operating agreement for [CDSG] in your email. Unless you have any questions or changes, we can execute it and the effective date is July 1st." As of July 1, 2024, Moore was still bound by the Consulting Agreement and the post-employment covenants in the Confidentiality Agreement.

146.   Days later, on June 24, 2024, Moore sent another text message to Absher and Ferguson, telling them that the Company would soon be experiencing a "***blood bath***" in the form of lost customers.

147.   In the same text message exchange, Absher stated to Moore and Ferguson that "***[w]e will [convert] All Assurant Accounts over time.***"

148.   Between October 2023 and March 2024, Absher had further discussions with Moore about putting a deal together with Ferguson to compete with the Company.

149.   In furtherance of these plans, Moore was complicit in and/or worked with Absher, Ferguson, and Jackson to misappropriate the Company's highly confidential information in the form of various pricing and financial documents, among other documents and information, to assist CDSG both in its own pricing, sales, and financial strategies in competition with the Company.

**Absher Lies to the Company About Retiring and Works with Ferguson and CDSG to Steal Highly Confidential Documents and Information for the Benefit of the CDSG Conspiracy**

150.  On February 12, 2024, Absher emailed the Company's Licensing Compliance Supervisor, stating, "I am going to be retiring March 1," and, "I will not need the license going forward as I am retiring from our industry."  In connection with this communication, Absher requested cancellation of all his insurance licenses *except* for his Georgia and Tennessee licenses.

151.  Absher made similar representations about intending to retire to other employees throughout February 2024 and told various Company representatives that he would forward all dealer client requests or inquiries back to the Company.

152.  Absher did not retire.

153.  Absher also did not forward all (or any) requests back to the Company.

154.  On February 26, 2024, Absher emailed the Senior Vice President of ADS, Jeff Strickland, implying that he would be retiring and spending more time with his family.

155.  On February 26, 2024, Absher emailed two ADS Regional Managers, stating "I will most likely still receive calls and various request [sic] from Dealerships and I will forward all request [sic] back to you guys going forward."

156.  Instead, Absher continued business with Ferguson and the CDSG Conspiracy—with whom Absher conspired (along with Moore and Jackson) to steal

the Company's highly confidential information.

157.  To carry out this plan, Ferguson and/or CDSG created the pseudonymous Gmail Account to disguise their scheme.

158.  On February 7, 2024, Ferguson and/or CDSG instructed Absher to "*[s]end everything to this email [the Gmail Account.]*"

159.  In early February 2024, Absher, who was still a consultant for the Company, requested the Company's highly confidential information under the guise of needing it to prepare for upcoming client meetings and to further the Company's business interests.

160.  Absher's stated purpose in obtaining that information was a ruse, however, as only very few of the business meetings that he had referenced were scheduled or occurred.

161.  Between February 7, 2024, and February 23, 2024, Absher, through these misrepresentations to his ADS co-workers, obtained approximately 70 documents containing sensitive, non-public financial information regarding the Company's clients, client contact information, and one competitively valuable document regarding the Company's business and sales strategies (that is, the sales script).

162.  At Ferguson's and/or CDSG's instruction, Absher sent these sensitive, highly confidential, and non-public Company documents via 28 separate emails to

the Gmail Account, which is owned and operated by Ferguson and/or CDSG.  In sending these documents, Absher and Ferguson used and disclosed the Company's confidential information to non-employee individuals and/or entities, and Ferguson and CDSG obtained and stole the Company's highly confidential information.

163.  Ferguson's disclosure and theft of the Company's highly confidential information was in violation of Ferguson's Confidentiality Agreement.

164.  Ferguson and CDSG quickly began using the stolen, highly confidential information to solicit the Company's clients.

165.  For example, just days after Ferguson and CDSG received the stolen information from Absher at the Gmail Account, Ferguson and Absher, on behalf of CDSG, met in person with a dealer client located in the Northern District of Georgia, Mountain Valley Motors, while Absher was still a consultant for the Company and while Absher was still subject to non-competition and non-solicitation covenants.

166.  Absher and Ferguson met with representatives of Mountain Valley Motors and another dealer client on February 27, 2024, to solicit those clients on behalf of CDSG for the benefit of themselves and the CDSG Conspiracy.

167.  Before, during, and/or shortly after those meetings, Absher, Ferguson, and CDSG used the Company's stolen confidential information to craft competing terms and sales pitches for those clients and unfairly compete with the Company.

168.  On February 28, 2024, and continuing until the present, Absher,

Ferguson, and CDSG continued contacting and meeting with other clients of the Company and used the stolen, highly confidential information to unfairly compete with the Company, undercut and/or match the Company's existing terms with each dealer, structure deals and new contracts with dealers based on the stolen information, undermine the Company's sales strategies, and/or integrate CDSG's products and offerings with the clients.

169.   As the Gmail Account belonged to Ferguson and/or CDSG, Absher never used the documents that he sent to the Gmail Account to further the Company's business interests.  Rather, those documents are in CDSG's possession, custody, and control, and the CDSG Conspiracy used those documents to solicit the Company's clients.

170.   The CDSG's theft of the Company's highly confidential information did not end when Absher's consulting period ended on March 1, 2024.

171.   On April 1, 2024, Absher, Ferguson, and CDSG were planning to meet with additional Company clients to solicit their business away from the Company to CDSG.

172.   Because Absher could no longer request access to the Company's information, Absher (on behalf of Ferguson and CDSG and, upon information and belief, Moore and Jackson) called Lester, a Company employee with access to Assurant's highly confidential dealer information and lied to her about his

relationship with the Company.

173.   Absher told Lester that he was still working with the Company and was having trouble accessing his Assurant email account.

174.   Absher told Lester that he needed certain highly confidential pricing information immediately for meetings with the dealer clients on behalf of the Company.

175.   Absher also asked Lester to send the documents and information to his personal email account (jhabsher@outlook.com), in violation of the Company's strict policies against doing so, given that he claimed that (1) he needed the documents right away and (2) he was having trouble with his Assurant email account.

176.   Lester, who did not know that Absher was no longer an employee or consultant for the Company, trusted Absher based on her years of experience working with him and sent Absher the highly confidential documents and pricing information he requested to Absher's personal email in violation of Company policy.

177.   Absher immediately forwarded the highly confidential documents and pricing information to Ferguson and CDSG at the Gmail Account, instructing Ferguson to print the information for use in upcoming meeting with these clients, which Ferguson and CDSG did.

178.   Absher and Ferguson, acting on behalf of CDSG, used the Company's

highly confidential documents and information received on April 1, 2024, to solicit several of the Company's dealer clients.

179.   Ultimately, most of these dealer clients switched their business from the Company to CDSG.

180.   The CDSG Conspiracy also conceived of and developed other avenues to take the Company's highly confidential pricing information.

## The CDSG Conspiracy Enlists the Assistance of Jackson and Moore to Steal the Company's Highly Confidential Documents and Information

### Jackson

181.   After Absher's consulting period with the Company ended on March 1, 2024, Absher, Ferguson, and CDSG enlisted the assistance of, and relied on, Moore and Jackson to continue providing inside, highly confidential documents and information to them in furtherance of the CDSG Conspiracy.

182.   For instance, on April 16, 2024, Absher was seeking highly confidential pricing information for one Georgia-based dealer client, Mike Reed Chevrolet.

183.   At or around 10 a.m. on the morning of April 16, 2024, Jackson made a request to the Company for the highly confidential pricing information that the Company maintains and develops for Mike Reed Chevrolet.

184.   Jackson, who was the Company representative for Mike Reed Chevrolet, was allowed to request access to the highly confidential pricing information, and he represented to the Company that he needed the information to

further the Company's interests.

185.   Within hours on April 16, 2024, Jackson relayed the pricing information to Absher and Ferguson, Absher texted Ferguson the Company's highly confidential pricing about Mike Reed Chevrolet received from Jackson, and the client began the process of switching its business to CDSG that same day.

186.   Similarly, on June 20 and June 21, 2024, Absher was seeking the Company's highly confidential pricing information about two other Georgia-based dealer clients, Lasseter Motors and Griffin Motors.

187.   Jackson was also the Company representative for these Georgia-based dealers, which allowed Jackson to request access to the highly confidential pricing information.

188.   Jackson represented to the Company that he needed the Company's highly confidential pricing information about Lasseter Motors and Griffin Motors to further the Company's interests.

189.   Jackson then communicated this information to Absher, and within 24 hours, Absher texted these Georgia-based dealer clients that he had "confirmed" or "verified" the Company's highly confidential pricing for them, stated he could do the "exact same" or for less, and made customized recommendations based on the Company's unique pricing to divert those clients to CDSG.

190.   The CDSG Conspiracy also used Jackson (who was at all relevant times

45

a Company employee subject to restrictive covenants and bound by a duty of loyalty) to solicit for CDSG's benefit other primarily Georgia-based Company clients that Jackson serviced for the Company.

191.   For example, on April 26, 2024, a CDSG employee or agent, Joe Fellin ("Fellin"), sent a text message to Absher and Ferguson with a picture of a blank form related to CDSG's business, stating one of the lines will be signed by Absher, Dino Trapp (another CDSG employee), or Jackson—even though Jackson was still an employee of the Company.

192.   On April 29, 2024, Jackson provided Absher with the Company's highly confidential pricing information pertaining to one of the Company's then-current Georgia-based dealer clients, NeSmith Chevrolet, and on the same day, Absher sent a text message with that exact pricing information to a representative of NeSmith Chevrolet.

193.   Within days, NeSmith Chevrolet switched its business from the Company to CDSG.

194.   On May 2, 2024, Absher attempted to cover his tracks and sent a text message to a representative of NeSmith Chevrolet, stating, "[o]ne more important item. Please don't mention my or Bobby[] [Jackson's] name to anyone at Assurant if anyone ask [sic]."

195.   On May 2, 2024, in a text message exchange between Jackson and

Absher where the two discussed a representative at NeSmith Chevrolet (which, as discussed above, moved its business to CDSG) wanting a refund for a sales reward trip offered by the Company, Jackson stated they "can't count on [that representative] to start communicating with Assurant without giving every detail[.]"

196.   Also on May 2, 2024, Absher added Jackson to a text message exchange with a representative from one of the Company's Georgia-based clients who then took their business to CDSG.

197.   On May 5, 2024, Fellin sent a text message to Absher and Ferguson, saying that he would reach out to Jackson so Jackson could contact a representative of another of the Company's Georgia-based dealer clients regarding that client moving its business to CDSG.

198.   On May 9, 2024, in a text message exchange between Absher, Ferguson, Fellin, and Jackson, Absher asked Fellin or Jackson to send a CDSG dealer profile sheet for a Georgia-based dealer client, Lasseter Motors, to Jackson's personal email address, and upon information and belief, that dealer then signed with CDSG and reduced or discontinued its business with the Company.

199.   In the same May 9, 2024 text message exchange, Absher also asked Jackson, "[d]id you tell our ex about [a dealer whose information the CDSG Conspiracy stole] changing? Please do if you haven't[,]" to which Jackson responded, "[y]es, I'll let them know[.]"

47

200.   On May 21, 2024, in a text message exchange with Absher, Ferguson, and Fellin, Absher stated that a dealer representative for a Georgia-based dealer approved of certain pricing and "is good with" "Bobby [Jackson] not being his rep for 90 days. *I explained that when the dust settles with Assurant[,] Bobby [Jackson] would be a big part of our future[.]*"

Moore

201.   The CDSG Conspiracy also used Moore to take the Company's highly confidential information.

202.   Upon information and belief, Moore began providing the Company's highly confidential information to CDSG as early as October 2023, when he stated "[l]et's put together a deal with Lance [Ferguson]. I'm ready."

203.   The CDSG Conspiracy continued discussing the use of Moore to unfairly compete with the Company from October 2023 through March 2024.

204.   In addition to the facts set forth above, on April 24, 2024, Absher texted Ferguson to "[c]all Wayne [Moore]" for highly confidential pricing and other information that the Company develops and maintains about a dealer client.

205.   While he was still performing services for the Company, on or about May 22, 2024, Moore stole the Company's Atlanta Braves baseball tickets and delivered them to Absher in the Northern District of Georgia for Absher's use in soliciting the Company's Georgia-based clients on behalf of the CDSG Conspiracy.

48

206.   On June 24, 2024, while attending a convention in Georgia, Moore sent another text message to Absher and Ferguson, claiming that the Company would soon be experiencing a "***blood bath***" in terms of lost customers.

207.   In the same text message exchange, Absher stated to Moore and Ferguson that "***[w]e will [convert] All Assurant Accounts over time.***"

208.   Upon information and belief, Moore, Absher, and Ferguson entered into the CDSG operating agreement in or around July 1, 2024, placing Moore in direct competition with the Company.

209.   The CDSG Conspiracy also used Moore to obtain the Company's highly confidential pricing information in furtherance of the conspiracy and so that the CDSG Conspiracy could use that information to unfairly compete with the Company.

210.   For instance, in or around December 2024, during Moore's consulting period with the Company, upon information and belief, Moore took a cruise with certain representatives of the Company's customers, used subterfuge and outright lies to request and receive from another Company employee highly confidential information pertaining to at least one of those customers, and solicited that customer to take their business from the Company to CDSG.

211.   Upon information and belief, the CDSG Conspiracy used Moore, Jackson, and others throughout 2024 and 2025 to take information that the Company

maintains and develops about numerous dealer clients in Georgia, among other locations.

212.   The CDSG Conspiracy used this information to unfairly compete with the Company.

213.   The CDSG Conspiracy also encouraged, solicited, convinced, or induced certain of the Company's dealer clients to breach their master dealer agreements with the Company by disclosing or providing members of the CDSG Conspiracy with documents and information designated as "Confidential Information" under the master dealer agreements.

214.   As described herein, Absher, Ferguson, CDSG, Moore, and Jackson all directly and indirectly participated in the conspiracy to steal the Company's proprietary, highly confidential information and to use that information to improperly solicit the Company's clients.

### The Nature of the Non-Public, Confidential Information the CDSG Conspiracy Stole

215.   The emails and attachments that Ferguson and CDSG obtained from Absher via the Gmail Account concerned and/or implicated approximately 29 different dealer clients of the Company.

216.   Among other confidential business information, the emails and attachments that Ferguson and CDSG obtained from Absher via the Gmail Account primarily consisted of four types of information: (1) highly confidential cover letters,

cession statements, reinsurance reports, and related financial information of various Company clients; (2) a highly confidential sales script and roadmap created and developed by the Company that would provide competitors a blueprint for undercutting the Company's sales strategies, pricing structures, and other methods for success in the marketplace; (3) a confidential list of e-mail contact information for the Company's dealer clients; and (4) master dealer agreements between the Company and certain dealer clients containing highly confidential financial information about the dealers' business relationships with the Company and the pricing they were receiving from the Company.

The Cession Statements and Top Sheets

217. On February 5 and 6, 2024, Absher emailed the Company's Reinsurance Manager and Reinsurance Analyst in ABIC's ADS Reinsurance Department requesting confidential cession statements for 24 dealer clients. Absher then received the requested information, which he stole from the Company, in this judicial district.

218. Pursuant to ABIC's Information Security Policy, the information contained in the cession statements is only available to a handful of ADS employees and is maintained in a password-protected database.

219. ADS sales employees and consultants, like Absher, did not and do not have access to this information, except upon request for legitimate business reasons,

and they execute confidentiality agreements requiring them to keep the Company's above-described information confidential.

220.   The cover letters, cession statements, and other documentation Absher stole in February 2024 constitute highly confidential information protected from disclosure under the Company's master dealer agreements with its dealer clients.

221.   Dealer clients also are subject to confidentiality agreements that protect this information that the Company furnishes, develops, and maintains about the dealer clients, and the dealer clients agree that this financial information is the "exclusive property of the Company."

222.   Cession statements and their accompanying data are highly confidential documents akin to detailed bank statements maintained by the Company that contain sensitive financial information for each dealer client, including, for example, monthly and year-to-date income derived from reinsurance products, number of claims made, amounts paid on claims, amount of reserves left to pay claims, amount of surplus funds available that the dealer can invest or withdraw from the account (net equity), as well as metrics and data concerning loss ratios.

223.   The cession statements and their accompanying data are valuable to the Company because they are not generally known to the public, as the statements permit the Company to maintain the relationship with the client, structure the terms and pricing with the client, prepare or modify short- and long-term reinsurance

strategies, and monitor company-wide whether its ADS business is performing at optimal levels.

224.    Cession statements and their top sheets are maintained as confidential information, as only approximately seven employees in ABIC's Reinsurance Department have direct access to them and the data they contain.  If an ADS employee (or consultant) requires a cession statement, they must reach out to one of those members of the Reinsurance Department to make a request for the information and state their legitimate business need for the information.  Cession statements are only disclosed to ADS employees outside of the Reinsurance Department on a need-to-know basis, and even then, only to certain ADS Division Managers, District Managers, and Regional Managers.

225.    ADS disseminates cession statements directly to one designated contact at each dealer client monthly (whether to the dealer him/herself or another designated contact, such as the CEO or CFO of the dealer's reinsurance company).

226.    In their roles as employees or consultants at the Company, none of the CDSG Conspiracy's members had direct access to cession statements. Thus, to acquire this information, Absher, Moore, or Jackson had to ask an employee in the Reinsurance Department to supply it to them and had to make a request supported by a legitimate business to acquire them.

227.    As of February 2024, Absher had no legitimate need for the cession

statements he requested as he, Ferguson, Moore, CDSG, and, upon information and belief, Jackson had already begun planning to solicit and/or were soliciting certain of the Company's clients to terminate their business with the Company and transfer it to another competitor for their benefit in the form of, among other things, commissions and continuing income.

228.   Upon information and belief, as early as or before January 1, 2024, Absher, Ferguson, and CDSG were making plans to take the cession statements to undercut Assurant's offers and switch the Company's clients to CDSG, NAC, APCO, or other competitors for whom or which the CDSG Conspiracy now performs services.

229.   Absher expressly represented to the Company that he required the cession statements to use during upcoming meetings with the dealer clients that he would be holding in February.  These statements were false and intended to induce the Company to rely upon them to supply him with the most current financial information for the affected clients.

230.   Upon information and belief, Absher did not meet with the dealer clients whose cession statements he requested in February to advance ABIC's business interests, despite his representation that he required that information for upcoming meetings.

231.   Indeed, Absher emailed the cession statements he requested for the

dealer clients to the Gmail Account for the CDSG Conspiracy's benefit, as members of the CDSG Conspiracy planned to use the cession statements to unfairly compete with the Company and/or harm the Company's business.

232.   Upon information and belief, the CDSG Conspiracy discussed how to obtain these cession statements and top sheets, intending to misappropriate the information and then use it to their competitive advantage or the advantage of other Company competitors, on behalf of whom or which the CDSG Conspiracy performs services competitive with the Company.

233.   In fact, Absher, Ferguson, CDSG and, upon information and belief, Moore and Jackson, have already used and continue to use the information contained in those cession statements to solicit the Company's dealer clients for the benefit of the CDSG Conspiracy.

The Sales Script

234.   On February 22, 2024, Absher sent three emails containing and/or attaching a sales script to the Gmail Account.  The sales script is a highly confidential document belonging to the Company, which ADS employees developed by compiling internal and client data in response to various questions from potential customers, and it thus forms the Company's blueprint needed to sell its products and services to

prospective dealer clients. Absher received this information, which he stole from the Company, in this judicial district.

235. More specifically, the sales script is a compilation of ABIC's intellectual property derived from numerous sources within the Company and is competitively valuable because it is a combination of confidential information regarding, among other things, ABIC's product offerings, pricing structures, reinsurance strategies, premiums and excise taxes, start-up fees, training class costs, investment options for unearned premiums, strategy for obtaining prospective clients, and the frequency with which ADS performs development services for the dealers.

236. This information is not combined anywhere else and offers a blueprint for a competitor on how to undercut the Company in the market and undermine the Company's short- and long-term sales strategies. As a result, the Company derives economic value from the sales script not being generally known to the public.

237. The sales script is maintained confidentially pursuant to the Company's Information Security Policy and is subject to protection under confidentiality agreements and other Company policies, as disclosure of the confidential information that makes up the sales script could cause commercial or operational harm if disclosed outside of the business. The highly confidential information that makes up the sales script has only been disseminated to a small, select group of ADS salespersons and executives within the Company who are

subject to confidentiality agreements, and they are not available to competitors or third parties other than the specific customer who posed the questions answered therein.

238.   The sales script would be valuable to the Company's competitors, such as CDSG, NAC, and APCO, and the Company has taken reasonable measures (such as requiring its employees and contractors to execute confidentiality agreements) to ensure it does not become available to its competitors, given the highly confidential information it contains.

239.   Thus, despite potential customers' various questions prompting the compilation of the sales script, the Company did not provide the sales script to any customers or otherwise disclose it outside of the small group of ADS salespersons and executives with access.

240.   Absher, Ferguson, and CDSG misappropriated the sales script to use the highly confidential information it contains to their competitive advantage and to solicit the Company's dealer clients.

241.   In fact, upon information and belief, Absher, Ferguson, Jackson, Moore, and CDSG have already modified, used, and continue to use the sales script to solicit the Company's dealer clients for the benefit of the CDSG Conspiracy.

<u>List of Customer E-Mail Addresses</u>

242.   On February 20, 2024, Absher forwarded an e-mail containing direct e-mail contact information for dozens of key contact personnel of the Company's dealer clients to the Gmail Account.   This information is highly confidential.   Absher received this information, which he stole from the Company, in this judicial district.

243.   E-mail addresses of key dealer personnel are not publicly available and are of particular importance to the Company's ADS business because it is extremely difficult to obtain the direct contact information for the individual dealers/owners, who do not typically share their e-mail contact information freely.   Instead, dealers usually have a designated point of contact (such as a general manager or similar person) who will field e-mails on behalf of the dealer.

244.   It can take years to develop a prospective dealer relationship to the point where the dealer is willing to share his or her e-mail address with ADS.

245.   Absher's, Ferguson's, and CDSG's misappropriation of this information from the Company's e-mail systems gave them a leg up in contacting and soliciting the impacted dealers' business away from the Company.

246.   In fact, at least on March 5, 2024, Ferguson used the customer list when he provided Absher one of the Company's client's email addresses from that list to contact that client on behalf of CDSG.

247.   Absher, Ferguson, and CDSG misappropriated the e-mail addresses to

use them to their competitive advantage and solicit the Company's dealer clients, and Absher, Ferguson, Moore, and CDSG have already used and continue to use the customer contact information to solicit the Company's dealer clients.

<u>Master Dealer Agreements and Pricing Information</u>

248.   Upon information and belief, throughout 2024 and 2025, the CDSG Conspiracy illegally obtained highly confidential master dealer agreements (the contracts between the Company and its dealer clients governing their relationship) and pricing information about numerous Assurant clients.   The master dealer agreements and pricing information contained therein are highly confidential and subject to nondisclosure provisions contained in the master dealer agreements between the Company and its dealer clients.  Absher received this information, which he stole from the Company, in this judicial district and transmitted it across state lines to CDSG and Ferguson.

249. Pursuant to the Company's Information Security Policy, the information contained in the master dealer agreements, such as pricing information specific to the client, is only available to a handful of Company employees and is maintained in a password-protected database.   Company sales employees and consultants, like Absher, Ferguson, Jackson, and Moore, did not and do not have access to this information, except upon request for legitimate business reasons, and they execute confidentiality agreements requiring them to keep the Company's

above-described information confidential.

250.   In the master dealer agreements, Assurant's dealer clients also agree to confidentiality provisions that protect this information that the Company furnishes, develops, and maintains about them, and the dealer clients agree that financial and pricing information is the "exclusive property of the Company."

251.   The automotive service and reinsurance industry also treats pricing information and other terms contained in these confidential agreements with clients as highly confidential information.

252. The CDSG Conspiracy obtained the Company's master dealer agreements and pricing information by using Company employees to represent that they needed the master dealer agreements and pricing information to further the Company's interests.   These statements were false and intended to induce the Company to rely upon them to supply them with the master dealer agreements and pricing information.

253.   Upon information and belief, the CDSG Conspiracy discussed how to obtain these master dealer agreements and pricing information, intending to take the information from Assurant and then use it to their competitive advantage or the advantage of other Company competitors such as NAC and APCO.

254. Master dealer agreements and pricing information are highly confidential documents that contain sensitive financial information for each dealer

client.

255.    For instance, one of the companies that create the products that CDSG sells also identifies similar agreements and pricing information that it develops for its clients and CDSG as highly confidential information.

256.    The Company derives value from master dealer agreements and pricing information not being generally known to the public, as they permit the Company to maintain the relationship with dealer clients, control the terms and pricing with the client, and guide short- and long-term reinsurance strategies.

257.    Master dealer agreements and pricing information are maintained as confidential information, as only approximately thirty employees in the Company have direct access to them and the data they contain.  If a Company employee (or consultant) requires a master dealer agreement or pricing information, they must reach out to one of those members of the Reinsurance Department to make a request for the information and state their legitimate business need for the information. Master dealer agreements and pricing information are only disclosed to Company employees outside of the Reinsurance Department on a need-to-know basis, and even then, only to "account owners" of the dealer clients, *i.e.*, certain ADS Division Managers, District Managers, and Regional Managers.

258.    When they were employees of the Company, none of the CDSG Conspiracy's members ever had direct access to master dealer agreements and

pricing information. Thus, to acquire this information during their employment, they had to ask an employee in the Reinsurance Department to supply it to them, and the request had to be for a legitimate business reason.

259.   The CDSG Conspiracy had no legitimate need for, much less a right to, master dealer agreements or pricing information, as, upon information and belief, Absher, Ferguson, Moore, Jackson, and CDSG had already begun soliciting the Company's clients to terminate their business with the Company in favor of a competitor and for the CDSG Conspiracy's benefit.

260.   Upon information and belief, as early as or before March 1, 2024, Absher, Ferguson, and CDSG were making plans to take the master dealer agreements and pricing information to undercut Assurant's offers and solicit the Company's clients to CDSG.

261.   Upon information and belief, Absher, Jackson, and Moore did not meet with clients whose master dealer agreements and pricing information they requested in 2024 and 2025 to advance the Company's business interests, despite their false representations that they needed the information to serve the Company's dealer clients.

262.   Indeed, the CDSG Conspiracy planned to use the master dealer agreements and pricing information to unfairly compete and/or harm ABIC's business.

263.   Absher, Ferguson, CDSG, Jackson, and Moore have used and continue to use the information contained in those master dealer agreements and pricing information to divert the Company's dealer clients to CDSG.

## Defendants Use the Stolen Company Information to Divert the Company's Clients

264.   During his consulting relationship and continuing within weeks of Absher's consulting agreement ending (and on the heels of Absher's, Ferguson's, and CDSG's misappropriation of the Company's highly confidential information), the Company noticed that certain of their dealer clients were terminating their business with Assurant.

265.   Specifically, more than fifteen dealer clients have terminated their business relationships with the Company because of the CDSG Conspiracy's theft of the Company's highly confidential information.  Absher's, Ferguson's, Moore's, and CDSG's solicitation efforts, carried out with Jackson's assistance, caused numerous Assurant dealer clients to transfer their business to CDSG.  This is continuing to occur, as at least three clients terminated their business with Assurant as recently as May 1, 2025.  In this way, Defendants' conduct has damaged the Company to Defendants' gain.

266.   Thus, Defendants are continuing to solicit and/or do business with many of the Company's former dealer clients, including the clients whose information Defendants stole.

267.    Absher's association with the CDSG Conspiracy began long before March 1, 2024, potentially as early as September or October 2023.

268.    Ferguson's and CDSG's association with the CDSG Conspiracy began as early as July 2022.

269.    Moore's association with the CDSG Conspiracy began well before his June 2024 email of the CDSG operating agreement to Ferguson and Absher, and potentially as early as September or October 2023.

270.    Jackson's association with the CDSG Conspiracy began during his employment with the Company and, upon information and belief, potentially as early as September or October 2023.

**COUNT I**
**Civil Violations of the Georgia RICO (Racketeer Influenced and Corrupt Organizations) Act, O.C.G.A. § 16-14-4(a)–(b), and Conspiracy to Violate the Georgia RICO Act, § 16-14-4(c), Against All Defendants**

271.    The Company repeats, realleges, and incorporates by reference paragraphs 1 through 270 of this Complaint as if fully restated herein.

272.    The Georgia RICO (Racketeer Influenced and Corrupt Organizations) Act, O.C.G.A. § 16-1-1, *et seq.*, makes it "unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity."  O.C.G.A. § 16-14-4(b).  As set forth more fully herein, Defendants violated this provision.

273.    The Georgia RICO Act also makes it "unlawful for any person, through

a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." *Id.* § 16-14-4(a). As set forth more fully herein, CDSG, by acquiring or maintaining money as proceeds derived from the CDSG Conspiracy's racketeering activity, violated this provision.

274.   The Georgia RICO Act further makes it "unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (a) or (b) of this Code section." *Id.* § 16-14-4(c). As set forth more fully herein, Defendants violated this provision.

275.   The Georgia RICO Act defines an "enterprise" as "any person, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this state, or other legal entity; or any unchartered union, association, or group of individuals associated in fact although not a legal entity; and it includes illicit as well as licit enterprises and governmental as well as other entities." *Id.* § 16-14-3(3).

276.   The Georgia RICO Act defines a "pattern of racketeering activity" as "[e]ngaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by

distinguishing characteristics and are not isolated incidents, provided at least one of such acts occurred after July 1, 1980, and that the last of such acts occurred within four years, excluding any periods of imprisonment, after the commission of a prior act of racketeering activity[.]" *Id.* § 16-14-3(4)(A).

277. In turn, the Georgia RICO Act defines "racketeering activity" as "to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit any crime which is chargeable by indictment under the laws of this state involving" an enumerated list of acts, including "[t]heft in violation of Article 1 of Chapter 8 of this title," which includes theft by deception and theft by receiving stolen property. *Id.* §§ 16-14-3(5)(A)(xii), 16-8-3, 16-8-13.

278. The Georgia RICO Act's "racketeering activity" definition also includes the federal counterpart's "racketeering activity" definition, which includes wire fraud. *Id.* § 16-14-3(5)(C); 18 U.S.C. §§ 1961(1)(B), 1343.

279. The Georgia RICO Act's "racketeering activity" definition also includes the theft of computer information. O.C.G.A. §§ 16-14-3(5)(A), 16-9-93(h).

280. As described herein, the CDSG Conspiracy—Ferguson, Moore, Jackson, CDSG, and Absher—constitute an enterprise as defined by the Georgia RICO Act, as they together constitute an "unchartered union, association, or group of individuals associated in fact although not a legal entity." *Id.* § 16-14-3(3).

281. Moreover, CDSG, standing alone, constitutes an "enterprise" as defined

by the Georgia RICO Act by virtue of being a legal entity itself and being formed for the purpose of carrying out the criminal activity described herein.  *Id.*

282.   By undertaking the actions alleged in this Complaint, Defendants, and other unknown members of the conspiracy and criminal enterprise, committed, conspired to commit, and/or attempted to commit the following predicate crimes:

   a.   Theft by Deception in violation of O.C.G.A. § 16-8-3;

   b.   Theft by Receiving Stolen Property in violation of O.C.G.A. § 16-8-7;

   c.   Wire Fraud in violation of 18 U.S.C. §§ 1961(1)(B), 1343;

   d.   Theft of Computer Information in violation of O.C.G.A. § 16-9-93; and

   e.   Theft of Trade Secrets in violation of O.C.G.A. § 16-8-13.

<u>The Theft by Deception Racket</u>

283.   CDSG and the CDSG Conspiracy, by its members individually and collectively, committed racketeering activity in the form of theft by deception, which occurs when one "obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property." *Id.* § 16-8-3(a).

284.   Absher and Defendants Ferguson, CDSG, Moore, Jackson, directly or indirectly, stole approximately 70 documents related to 29 automotive dealers in the Gmail Account by reason of Absher's various intentional misrepresentations regarding his need for those documents.

285.   The documents Absher emailed to Ferguson and CDSG contained

highly confidential information belonging to the Company, and the documents themselves are Company property.

286.   Absher made statements to Assurant employees, including but not limited to Lester, which ultimately "[c]reate[d] or confirm[ed]" those employees' "impression of an existing fact or past event which is false and which" Absher knew or believed to be false. *Id.* §§ 16-14-3(5)(A)(xii), 16-8-3(a), 16-8-3(b)(1).

287.   Based on Absher's misrepresentations, as detailed herein, Absher then received highly confidential documents and information from the Company, which he stole for the benefit of the CDSG Conspiracy and sent to the Gmail Account.

288.   Defendants Ferguson and CDSG furthered Absher's criminal actions and participated in the conspiracy by creating the Gmail Account and specifically instructing Absher to "[s]end everything to this email [the Gmail Account.]"

289.   Absher and Defendants Moore, Jackson, and, directly or indirectly, Defendants Ferguson and CDSG, also committed theft by deception by accepting money from the Company paid as salary, consulting fees, or other compensation during the period of time that they were working for the CDSG Conspiracy, which, upon information and belief, they used to fund CDSG's operations and solicitation efforts that were designed to damage the Company.

290.   Absher and Defendants Moore and Jackson deliberately misled the Company by creating the false impression that they were working in the Company's

interests when they requested highly confidential documents and information from Company employees when, in fact, they were stealing such information for the benefit of the CDSG Conspiracy.

291.   Defendant Moore also stole the Company's Atlanta Braves tickets for the benefit of the CDSG Conspiracy on May 22, 2024, by, upon information and belief, creating the false impression that Moore needed such tickets to entertain Company clients when, in fact, he transferred the tickets to Absher for his use in soliciting Company clients on behalf of CDSG.

292.   Absher and Defendants Ferguson, CDSG, Jackson, and Moore also stole the Company's highly confidential documents and information through misrepresentations that Moore and Jackson made to Company employees regarding their need for such documents and information to further the Company's interests.

293.   For example, Defendants Moore and Jackson, in furtherance of the conspiracy and for the benefit of the CDSG Conspiracy, made material misrepresentations of fact to Company employees regarding their need for highly confidential documents and information about the Company's dealer clients to induce them to provide him with such information.

294.   Defendants Moore and Jackson created the false impression that they were working to further the Company's interests when, in fact, they stole the Company's documents and information for the purpose of harming the Company

through solicitation and diversion of its clients.

295.   Defendants Moore and Jackson coordinated with the CDSG Conspiracy during their employment (Jackson) and consulting period (Moore) to provide to the CDSG Conspiracy with stolen, customer-specific, highly confidential documents and information regarding the Company's dealer clients upon request.

296.   By intentionally creating or confirming the Company's impressions as to existing facts or past events material to the Company's decision to provide Absher and Defendants Moore and Jackson with highly confidential documents and information, Defendants directly or indirectly violated O.C.G.A. § 16-8-3.

The Theft by Receiving Stolen Property Racket

297.   CDSG itself, and the CDSG Conspiracy, by its members individually and collectively, committed racketeering activity in the form of theft by receiving stolen property, which occurs when one "receives, disposes of, or retains stolen property which he knows or should know was stolen unless the property is received, disposed of, or retained with intent to restore it to the owner." O.C.G.A. § 16-8-7(a).

298.   Absher and Defendants Ferguson, CDSG, Moore, Jackson, directly or indirectly, received highly confidential documents and information stolen from the Company by reason of Absher's, Moore's, and Jackson's various intentional misrepresentations regarding their need for those documents.

299.   The documents Absher emailed to Ferguson and CDSG contained

highly confidential information belonging to the Company and the documents themselves are Company property.

300. Based on Absher's and Defendants Moore's and Jackson's misrepresentations, as detailed herein, the CDSG Conspiracy then received highly confidential documents and information stolen from the Company.

301. Defendants Ferguson and CDSG furthered Absher's and Defendants Moore's and Jackson's criminal actions and participated in the conspiracy by receiving and accepting the highly confidential documents and information via the Gmail Account and by, among other things, specifically instructing Absher to "[s]end everything to this email [the Gmail Account.]"

302. Absher and Defendants Moore, Jackson, and, directly or indirectly, Defendants Ferguson and CDSG, also committed theft by receiving and accepting money from the Company paid as salary, consulting fees, or other compensation during the period of time that they were working for the CDSG Conspiracy, which, upon information and belief, they used to fund CDSG's operations and solicitation efforts that were designed to damage the Company.

303. The CDSG Conspiracy also received Atlanta Braves tickets that Moore stole for the benefit of the CDSG Conspiracy on or about May 22, 2024, when he transferred the tickets to Absher for his use in soliciting Company clients on behalf of CDSG.

304.   Defendants Moore and Jackson, on behalf of the CDSG Conspiracy, also received highly confidential documents and information stolen from the Company, which they obtained through lies and deception, as detailed herein.

305.   Defendants Moore and Jackson coordinated with the CDSG Conspiracy during their employment (Jackson) and consulting period (Moore) to receive stolen, customer-specific, highly confidential documents and information regarding the Company's dealer clients.

306.   Absher and Defendants knew or should have known the highly confidential documents and information they received from the Company under false pretenses were stolen, and Defendants had no intent to restore said documents to the Company.

307.   By receiving, disposing of, or retaining stolen property which they knew or should have known were stolen, with no intent of restoring that property to Assurant, Defendants have committed the offense of theft by receiving stolen property, in violation of O.C.G.A. § 16-8-7(a).

<u>The Wire Fraud Racket</u>

308.   The CDSG Conspiracy, by its members individually and collectively, engaged in racketeering activity in the form of wire fraud, which occurs when one, "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses,

representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343.

309.   The CDSG Conspiracy, through the scheme and artifice they devised to defraud Assurant out of money and property, as described herein, committed wire fraud by using wire communications for the purpose of executing their scheme or artifice.

310.   Absher obtained such highly confidential documents and information through misrepresentations made via phone, email, and text message communications to Company employees, which Absher then transmitted via interstate wire communications from within the Northern District of Georgia to the Gmail Account owned and operated by Ferguson and CDSG in the State of Tennessee. *Id.*; *see also* O.C.G.A. § 16-14-3(5)(C); 18 U.S.C. § 1961(1)(B).

311.   The CDSG Conspiracy, by its members individually and collectively, further engaged in racketeering activity in the form of wire fraud when Jackson, who committed the acts described herein while employed by the Company, remained in contact with members of the CDSG Conspiracy via phone call, text message, and email, and was oftentimes instructed or otherwise planned to obtain highly confidential documents and information pertaining to the Company's dealer clients

through artifice, which he received by misrepresenting to other Company employees via telephone, email, or other electronic communications his alleged need for said highly confidential documents and information, which he then transmitted from the State of Georgia to other members of the CDSG Conspiracy via telephone, email, text message, or other electronic means.

312.   The CDSG Conspiracy, by its members individually and collectively, further engaged in racketeering activity in the form of wire fraud when Jackson accepted, retained, and thereby stole electronic payments of salary and other compensation from the Company while he was directly and clandestinely competing with the Company by participating in the conspiracy.  This included, for example, Jackson making material misrepresentations to Company employees regarding his alleged need for highly confidential information regarding the Company's dealer clients to create the false impression that he was acting in accordance with the Company's interests.

313.   The CDSG Conspiracy, by its members individually and collectively, further engaged in racketeering activity in the form of wire fraud when Moore, through interstate communications, remained in contact with members of the CDSG Conspiracy via phone call, text message, and email, and, upon information and belief, requested highly confidential information from Company employees via phone, text message, email or other electronic communication pertaining to the

Company's dealer clients by misrepresenting his alleged need for said highly confidential information, which Moore then received via email and transmitted to other members of the CDSG conspiracy via phone, text message, email, or other electronic means.

314.   The CDSG Conspiracy, by its members individually and collectively, further engaged in racketeering activity in the form of wire fraud when Moore accepted, retained, and thereby stole electronic payments of compensation from the Company pursuant to the Consulting Agreement while he was directly and clandestinely competing with the Company by participating in the conspiracy and, upon information and belief, making material misrepresentations of fact to Company employees via phone, text message, email, or other electronic communications to induce them to provide him with highly confidential information regarding the Company's dealer clients for the benefit of the CDSG Conspiracy.

315.   The CDSG Conspiracy, by its members individually and collectively, conspired to commit racketeering activity in the form of wire fraud when Moore made false representations to the Company regarding his need or use for the Company's Atlanta Braves tickets to further the Company's interests, which he then transferred to Absher for the benefit of the CDSG Conspiracy.

316.   All members of the CDSG Conspiracy committed, participated in, ratified, or accepted the benefits of the foregoing acts of wire fraud with the specific

intent to deceive, cheat, injure, and/or steal money and property from the Company.

317.   Absher made material misrepresentations regarding his need for highly confidential documents and information to Assurant employees in February and April 2024, as alleged herein, and transmitted the stolen documents and information to Ferguson and CDSG via the Gmail Account via separate emails.  Each email constitutes at least the predicate acts of theft by deception and wire fraud, such that there was a sufficient "pattern of racketeering activity" between and among Absher, Ferguson, and CDSG.

318.  This "pattern of racketeering activity carried on after Absher's consulting period ended on March 1, 2024, through, among other things, Moore's and Jackson's continuing to further the conspiracy by requesting certain confidential and proprietary documents and information from Company employees based on misrepresentations and outright lies regarding their need and purpose for the information, which was requested and used for the benefit of CDSG and the CDSG Conspiracy.

319.   This "pattern of racketeering activity" also continued when Absher lied to Lester about his status with the Company in April 2024 to receive additional confidential and proprietary information from Lester, all of which was then transmitted and/or used by members of the CDSG Conspiracy for its gain.  O.C.G.A. § 16-14-3(4)(A).

320.   The CDSG Conspiracy, by and through its members individually and collectively, by devising or intending to devise the scheme and artifice described above, which was intended to defraud Assurant, and for obtaining Assurant's money and property by means of false or fraudulent pretenses, representations, or promises, and transmitting or causing to be transmitted by means of wire and other electronic communications in interstate commerce, writings or other electronic communications for purposes of executing the CDSG Conspiracy's scheme and artifice, Defendants committed wire fraud in violation of 18 U.S.C. § 1343.

<u>The Theft of Computer Information Racket</u>

321.   CDSG and the CDSG Conspiracy, by its members individually and collectively, committed racketeering activity in the form of theft of computer information, which occurs when one uses a computer or computer network with knowledge that such use is without authority and with the intention of: (1) taking or appropriating any property of another, whether or not with the intention of depriving the owner of possession; (2) obtaining property by any deceitful means or artful practice; or (3) converting property to such person's use in violation of an agreement or other known legal obligation to make a specified application or disposition of such property.  O.C.G.A. § 16-9-93(a).

322.   Absher and Defendants Jackson and Moore used Company-owned computers and the Company's computer network to obtain highly confidential

documents and information for the benefit of the CDSG Conspiracy and without permission or authority to use such computers and computer networks for their fraudulent and criminal purposes.

323.    CDSG and the CDSG Conspiracy, by its members individually and collectively, committed racketeering activity in the form of theft of computer information when Absher used his Company-owned laptop and the Company's computer network to make material misrepresentations of fact to Company employees regarding his need for highly confidential documents and information about the Company's dealer clients.

324.    Absher knowingly and purposefully made the false representations described herein for the direct benefit of, and with the approval and participation of, the CDSG Conspiracy, to take Assurant's property (computer information) for use in the CDSG Conspiracy's efforts to divert the Company's clients using the Company's highly confidential documents and information.

325.    Through Absher's theft of Assurant's computer information, CDSG and the CDSG Conspiracy obtained the Company's property through deceitful means or artful practice.

326.    Absher's conversion of Assurant's property, which Absher stole at the direction of, with the knowledge of, and with the consent of the CDSG Conspiracy, were in direct violation of Absher's Confidentiality Agreement and Consulting

Agreement, and other known legal obligations (such as fiduciary duties) to use Assurant's highly confidential computer information only to advance the Company's legitimate business interests.

327.  CDSG and the CDSG Conspiracy, by its members individually and collectively, committed racketeering activity in the form of theft of computer information when Moore used his Company-owned laptop and the Company's computer network to make material misrepresentations of fact to Company employees regarding his need for highly confidential documents and information about the Company's dealer clients.

328.  CDSG and the CDSG Conspiracy, by its members individually and collectively, committed racketeering activity in the form of theft of computer information when, upon information and belief, Moore used his Company-owned laptop and the Company's computer network to make material misrepresentations of fact to the Company on or about May 22, 2024, regarding his need for the Company's Atlanta Braves tickets, which he then delivered to Absher using the Company's computer network for the CDSG Conspiracy's benefit.

329.  Moore knowingly and purposefully made the false representations described herein for the direct benefit of, and with the approval and participation of, the CDSG Conspiracy, to take Assurant's property (computer information) for use in the CDSG Conspiracy's efforts to divert the Company's clients using the

Company's highly confidential documents and information and its Atlanta Braves tickets.

330. Through Moore's theft of Assurant's computer information and Atlanta Braves tickets, CDSG and the CDSG Conspiracy obtained the Company's property through deceitful means or artful practice.

331. Moore's conversion of Assurant's property, which Moore stole at the direction of, with the knowledge of, and with the consent of the CDSG Conspiracy, were in direct violation of Moore's Confidentiality Agreement and Consulting Agreement, and other known legal obligations (such as fiduciary duties) to use Assurant's highly confidential computer information and property only to advance the Company's legitimate business interests.

332. CDSG and the CDSG Conspiracy, by its members individually and collectively, committed racketeering activity in the form of theft of computer information when Jackson used his Company-owned laptop and the Company's computer network to make material misrepresentations of fact to Company employees regarding his need for highly confidential documents and information about the Company's dealer clients.

333. Jackson knowingly and purposefully made the false representations described herein for the direct benefit of, and with the approval and participation of, the CDSG Conspiracy, to take Assurant's property (computer information) for use

in the CDSG Conspiracy's efforts to divert the Company's clients using the Company's highly confidential documents and information.

334.  Through Jackson's theft of Assurant's computer information, CDSG and the CDSG Conspiracy obtained the Company's property through deceitful means or artful practice.

335.  Jackson's conversion of Assurant's property, which Absher stole at the direction of, with the knowledge of, and with the consent of the CDSG Conspiracy, were in direct violation of Jackson's known legal obligations (such as fiduciary duties) to use Assurant's highly confidential computer information only to advance the Company's legitimate business interests.

336.  CDSG and the CDSG Conspiracy, by its members individually and collectively, committed racketeering activity in the form of theft of computer information, through the actions of Absher, Moore, and Jackson, who used Assurant's computer or computer network with knowledge that such use is without authority and with the intention of stealing Assurant's property with the intention of depriving Assurant of that property, obtaining computer information and Atlanta Braves tickets by deceitful means or artful practice, and/or converting Assurant's property to the CDSG Conspiracy's use and benefit in violation of their applicable agreements and fiduciary duties to only use the Company's computer information and property for its benefit.

337.   Accordingly, Defendants violated O.C.G.A. § 16-9-93(a).

<u>The Theft of Trade Secrets Racket</u>

338.   CDSG and the CDSG Conspiracy, by its members individually and collectively, committed racketeering activity in the form of theft of trade secrets, which occurs when one, "with the intent to deprive or withhold from the owner thereof the exclusive use of a trade secret, or with an intent to appropriate a trade secret to his or her own use or to the use of another, does any of the following: (1) [t]akes, uses, or discloses such trade secret to an unauthorized person; (2) [a]cquires knowledge of such trade secret by deceitful means or artful practice; or (3) [w]ithout authority, makes or causes to be made a copy of an article representing such trade secret[.]" *Id.* § 16-8-13(b).

339.   Some or all the highly confidential documents and information described in this Complaint as having been stolen by the CDSG Conspiracy, including but not limited to cover letters, cession statements, reinsurance reports, master dealer agreements, the sales script, confidential client lists, financial information, pricing information, sales and marketing strategies, and other documents and other electronically stored information described herein constitute trade secrets under O.C.G.A. § 16-8-13(a)(4).

340.   That is, some or all the highly confidential documents and information described in this Complaint as having been stolen by the CDSG Conspiracy, (1)

derive economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, persons such as the members of the CDSG Conspiracy, who can obtain economic value from their disclosure or use, as described in this Complaint; and (2) were the subject of efforts that are reasonable under the circumstances to maintain their secrecy, also as described in this Complaint.

341.   CDSG and the CDSG Conspiracy, by its members individually and collectively, committed racketeering activity in the form of theft of trade secrets when Absher requested under false pretenses and took the February 2024 Stolen Information and the April 2024 Stolen Information from the Company, disclosed it to Ferguson and CDSG via the Gmail Account, and then used that information in coordination with Ferguson, CDSG, and, upon information and belief, other members of the CDSG Conspiracy to divert the Company's dealer clients to CDSG.

342.   Thus, Absher, Ferguson, CDSG, and, upon information and belief, other members of the CDSG Conspiracy obtained Assurant's trade secrets contained within the February 2024 Stolen Information and the April 2024 Stolen Information by deceitful means or artful practice for the benefit of the CDSG Conspiracy.

343.   Further, Absher, Ferguson, CDSG, and, upon information and belief, other members of the CDSG Conspiracy, made unauthorized copies of Assurant's trade secrets, as described herein, for their use in soliciting the Company's clients to

switch their business to CDSG.

344.    CDSG and the CDSG Conspiracy, by its members individually and collectively, committed racketeering activity in the form of theft of trade secrets when Jackson and Moore requested under false pretenses and took highly confidential financial and pricing information from the Company, which they disclosed to Ferguson, Absher, and CDSG, who then, in coordination with Jackson and Moore, used those trade secrets to divert the Company's dealer clients to CDSG.

345.    Thus, Jackson, Moore, and the other members of the CDSG Conspiracy obtained Assurant's trade secrets contained within the highly confidential documents and information Jackson and Moore took from the Company by deceitful means or artful practice, as described herein, for the benefit of the CDSG Conspiracy.

346.    Further, upon information and belief, Jackson, Moore, and the other members of the CDSG Conspiracy made unauthorized copies the Company trade secrets that Jackson and Moore took from the Company, as described herein, for the CDSG Conspiracy's use in soliciting the Company's clients to switch their business to CDSG.

347.    Accordingly, Defendants violated O.C.G.A. § 16-8-13(b).

<u>Defendants' Conspiracy to Violate Georgia's RICO Act via Coordinated Efforts to Steal from the Company</u>

348.    Through their coordinated efforts to steal from the Company through a pattern of racketeering activity—the commission of the predicate acts described

above—Defendants violated O.C.G.A. § 16-14-4(a).

349.   Through its individual efforts to steal from the Company through a pattern of racketeering activity, as described herein, including the predicate acts described above, CDSG as a standalone "enterprise" violated § 16-14-4(a).

350.   Defendants further violated O.C.G.A. § 16-14-4(a) through their coordinated efforts by obtaining control of the Company's property through the corrupt individual Defendants and Absher, who were also Assurant employees or consultants.

351.   Defendants additionally violated O.C.G.A. § 16-14-4(b) through their association with, and participation in, the criminal enterprise described above, for which the common purpose was to systematically steal from Assurant for Defendants' benefit.

352.   Defendants also violated O.C.G.A. § 16-14-4(c) by conspiring together to violate the Georgia RICO Act by stealing from Assurant.

353.   As alleged herein, Absher, Defendant Ferguson, Defendant CDSG, and, upon information and belief, Defendant Moore, began this scheme to steal Assurant's highly confidential documents and information, along with Assurant's money paid to Absher and Moore as compensation for their purported services as employees and contractors of the Company.

354.   As evidenced by emails, text messages, and other communications, the

coordinated solicitation of the Company's dealer clients, the loss of such dealer clients, and related activity by the CDSG Conspiracy, it is clear that Defendants formed an enterprise in fact pursuant to O.C.G.A. § 16-14-3(3) and engaged in theft by deception, theft by receiving stolen property, wire fraud, theft of computer information, and theft of trade secrets via the methods described above.

355.    Based on the measures Absher, Ferguson, CDSG, Moore, and Jackson took to conceal their theft of the Company's highly confidential documents and information, as shown through private emails and text messages, and through the establishment of the pseudonymous Gmail Account, Defendants worked to steal from Assurant.

356.    Plaintiffs are entitled to remedial orders that prevent the individual and entity Defendants from continuing to engage in racketeering activity pursuant to O.C.G.A. §§ 16-14-6(a) and (b).

357.    Between approximately September 2023 and the present, Defendants each participated in the above-described acts in furtherance of their enterprise as described herein.

358.    Plaintiffs are entitled to an award of actual damages, treble damages, punitive damages, and attorneys' fees against Defendants, jointly and severally, pursuant to O.C.G.A. § 16-14-6(c).

359.    Moreover, as described more fully herein, CDSG has directly profited

from the CDSG Conspiracy's racketeering activities; specifically, the CDSG Conspiracy's racketeering activities as described herein have generated business for CDSG in the form of at least fifteen of the Company's former dealer clients who took their business from the Company to CDSG, and as described herein, those former dealer clients now do business with CDSG at least in part because of the CDSG Conspiracy's ability to match, mimic, undercut, and/or otherwise tailor pricing and deal structures to entice dealer clients to discontinue doing business with the Company in favor of CDSG, directly resulting from the CDSG Conspiracy's various racketeering activities as outlined herein.

360.   As such, CDSG has "acquire[d] or maintain[ed], directly or indirectly, any interest in or control of . . . personal property of any nature, including money," as prohibited by the Georgia RICO Act.  *Id.* § 16-14-4(a).

361.   Accordingly, Plaintiffs seek all civil remedies available against CDSG for its standalone violations of the Georgia RICO Act, including but not limited to those outlined in O.C.G.A. § 16-14-6(c), and Plaintiffs specifically request dissolution of CDSG pursuant to O.C.G.A. § 16-14-6(a)(3).

## COUNT II
### Breach of Fiduciary Duty Against Defendant Jackson

362.   The Company repeats, realleges, and incorporates by reference paragraphs 1 through 270 of this Complaint as if fully restated herein.

363.   During his employment with the Company, which is continuing, Jackson owed a fiduciary duty of loyalty to the Company.

364.   Jackson breached his fiduciary duty (duty of loyalty) to the Company through the conduct alleged herein, including but not limited to: (i) competing with the Company while employed by the Company; (ii) soliciting or assisting in the solicitation of the Company's clients, which were largely Georgia-based and for which Jackson served as the Company's representative, while still employed by the Company; and (iii) disclosing the Company's confidential information pertaining to those dealer clients to members of the CDSG Conspiracy.

365.   As a result of Jackson's breaches, Jackson has caused and is causing AFAS irreparable harm to its goodwill, reputation, customer relationship, and other business interests by virtue of his assistance in the CDSG Conspiracy's overarching schemes, his direct competition with the Company, his disclosure of the Company's highly confidential information to the members of the CDSG Conspiracy, and his assistance in soliciting the Company's clients on behalf of and for the benefit of the CDSG Conspiracy.

366.   As a result of Jackson's breaches, AFAS has been damaged in an amount to be determined at trial.

367. Jackson's actions showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which raises the presumption

of conscious indifference to consequences.  As such, Plaintiffs are entitled to an award of punitive damages against Jackson.

368.  Jackson has acted in bad faith, was stubbornly litigious, and caused Plaintiffs unnecessary trouble and expense, and Plaintiffs are separately entitled to recover its attorneys' fees and costs from Jackson pursuant to O.C.G.A. § 13-6-11.

<u>COUNT III</u>
**Aiding and Abetting Breach of Fiduciary Duties Against Defendants Ferguson and CDSG**

369.  The Company repeats, realleges, and incorporates by reference paragraphs 1 through 270 of this Complaint as if fully restated herein.

370.  Ferguson and CDSG aided and abetted Moore's and Jackson's breaches of their fiduciary duties.

371.  Specifically, Ferguson and CDSG, through their improper and illegal actions described herein, and without privilege, acted to procure Moore's (while he was still an employee) and Jackson's breach of their fiduciary duties to the Company.

372.  Ferguson and CDSG knew that, because Moore and Jackson were employees of Assurant, they owed fiduciary duties to Plaintiffs, but nevertheless Ferguson and CDSG acted purposely to cause Moore and Jackson to breach their fiduciary duties to Plaintiffs with the intent to injure Plaintiffs.

373.  Ferguson and CDSG, through their wrongful conduct as alleged herein, procured Moore's and Jackson's breaches of their fiduciary duties to Plaintiffs,

including but not limited to Moore's and Jackson's theft, use, and disclosure of the Company's highly confidential information, theft of salary and other compensation paid to them while they were clandestinely and illegally competing against the Company, and material misrepresentations Moore and Jackson made to the Company for the benefit of the CDSG Conspiracy.

374.    As a direct and proximate result of Defendants' tortious conduct, Plaintiffs have suffered damages in an amount to be determined at trial.

375.    Ferguson's and CDSG's actions showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which raises the presumption of conscious indifference to consequences.  As such, Plaintiffs are entitled to an award of punitive damages against Ferguson and CDSG.

376.    Ferguson and CDSG acted in bad faith, were stubbornly litigious, and caused Plaintiffs unnecessary trouble and expense, and Plaintiffs are separately entitled to recover its attorneys' fees and costs from Ferguson and CDSG pursuant to O.C.G.A. § 13-6-11.

## COUNT IV
**Tortious Interference with Contractual and Business Relations Against Defendants Ferguson and CDSG (Dealer Clients)**

377.    The Company repeats, realleges, and incorporates by reference paragraphs 1 through 270 of this Complaint as if fully restated herein.

378.    The Company maintains contractual and business relationships with its

various automotive dealer clients, and those clients in turn confer upon the Company a contractual right of payment and/or other contractual rights, including, for example, the dealer clients' obligations to keep confidential the financial, pricing, and related information that is defined as "Confidential Information" under the master dealer agreements.

379. Ferguson and CDSG are strangers to the Company's contracts with its dealer clients.

380. As described herein, Ferguson and CDSG conspired with Absher to steal confidential information from the Company, which Ferguson and CDSG then used to wrongfully and without privilege solicit the Company's clients—with Ferguson and CDSG knowing that contractual and business relations existed between the dealer clients and the Company—to induce them into ending their business with the Company in favor of CDSG.

381. Specifically, approximately fifteen dealers have terminated their business relationships with the Company in favor of CDSG as a result of Ferguson's and CDSG's theft of the Company's highly confidential information and solicitation. This is continuing to occur, as three such clients terminated their business with Assurant as recently as May 1, 2025, and Ferguson and CDSG continue to solicit the Company's clients.

382. In this way, Ferguson's and CDSG's conduct has damaged the

Company.

383.    Ferguson and CDSG have also wrongfully and without privilege induced or convinced dealer clients to breach the master dealer agreements with Assurant by inducing, convincing, or asking certain dealer clients to provide Ferguson, CDSG, and Absher with highly confidential financial, pricing, and related information about their businesses for the benefit of the CDSG Conspiracy.

384.    Ferguson's and CDSG's actions evidence their malicious intent to directly interfere with the Company's contractual relations with various dealer clients and to injure the Company.

385.    As a result of Ferguson's and CDSG's malicious and intentional actions against the Company, as alleged herein, the Company has suffered damages in an amount to be proven at trial.

386.    Ferguson's and CDSG's actions showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which raises the presumption of conscious indifference to consequences.  As such, Plaintiffs are entitled to an award of punitive damages against Ferguson and CDSG.

387.    Ferguson and CDSG acted in bad faith, were stubbornly litigious, and caused Plaintiffs unnecessary trouble and expense, and Plaintiffs are separately entitled to recover its attorneys' fees and costs from Ferguson and CDSG pursuant to O.C.G.A. § 13-6-11.

## COUNT V

### Tortious Interference with Contractual and Business Relations Against Defendants Ferguson and CDSG (Moore, Absher, and Jackson)

388.   The Company repeats, realleges, and incorporates by reference paragraphs 1 through 270 of this Complaint as if fully restated herein.

389.   The Company maintains employment and contractual relationships with its employees and consultants, and its employees and consultants in turn provide services to the Company and owe contractual duties and, in the case of employees, duties of loyalty to the Company.

390.   Ferguson and CDSG are strangers to the contracts and business relationships that the Company has with its employees.

391.   As described herein, Ferguson and CDSG wrongfully and without privilege induced Absher and Moore to breach their restrictive covenants with the Company and induced Moore and Jackson to breach their fiduciary duties owed to the Company by inducing them to steal highly confidential documents and information from the Company, steal money from the Company, and clandestinely compete with the Company for the benefit of Ferguson, CDSG, and the CDSG Conspiracy.

392.   Upon information and belief, Ferguson and CDSG financially incentivized Absher and Moore to breach their contractual duties (and, in Absher's case, fiduciary duties as well) to the Company by offering them ownership interests

in CDSG.

393.   Ferguson and CDSG also offered compensation or other perquisites or benefits to Jackson for his participation in the conspiracy described herein, by which he breached his fiduciary duties to the Company.

394.   Moreover, as described herein, Ferguson and CDSG acted maliciously, as evidenced by their willful acts that ultimately violated known rights of the Company, and they had no legal justification for doing so.

395. Ferguson's and CDSG's acts of tortious interference with the Company's contracts and/or business relationships with Moore, Absher, and Jackson ultimately resulted in at least fifteen dealer clients switching their business from the Company to CDSG, directly causing CDSG injury to the benefit of Ferguson, CDSG, and the CDSG Conspiracy.

396.   As a result of Ferguson's and CDSG's acts of tortious interference, the Company has sustained damages in an amount to be determined at trial.

397.   Ferguson's and CDSG's actions showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which raises the presumption of conscious indifference to consequences.  As such, Plaintiffs are entitled to an award of punitive damages against Ferguson and CDSG.

398.   Ferguson and CDSG acted in bad faith, were stubbornly litigious, and caused Plaintiffs unnecessary trouble and expense, and Plaintiffs are separately

entitled to recover their attorneys' fees and costs from Ferguson and CDSG pursuant to O.C.G.A. § 13-6-11.

## COUNT VI
### Breach of Contract Against Defendant Ferguson by AFAS

399. The Company repeats, realleges, and incorporates by reference paragraphs 1 through 270 of this Complaint as if fully restated herein.

400. AFAS and Ferguson are parties to the Confidentiality Agreement, which is a valid, binding contract.

401. AFAS performed its obligations under the Confidentiality Agreement or was excused from doing so.

402. Defendant Ferguson breached the Confidentiality Agreement through the conduct alleged herein, including but not limited to: (i) misappropriating highly confidential documents and information of the Company for his own use and (ii) using highly confidential documents and information of the Company to solicit customers away from the Company.

403. As a result of Ferguson's breaches of the Confidentiality Agreement, Ferguson has caused and is causing AFAS harm.

404. As a result of Ferguson's breaches of the Confidentiality Agreement, AFAS has been damaged in an amount to be determined at trial.

405. Pursuant to the "Attorneys' Fees" provision of the Confidentiality Agreement, AFAS is entitled to its attorneys' fees and costs in having to bring this

lawsuit against Ferguson.

406.  Ferguson has acted in bad faith, was stubbornly litigious, and caused AFAS unnecessary trouble and expense with respect to the performance of the Confidentiality Agreement, and AFAS is separately entitled to recover its attorneys' fees and costs from Ferguson pursuant to O.C.G.A. § 13-6-11.

## COUNT VII
### Breach of Contract Against Defendant Moore by ABIC (the Consulting Agreement)

407.  The Company repeats, realleges, and incorporates by reference paragraphs 1 through 270 of this Complaint as if fully restated herein.

408.  ABIC and Moore are parties to the Consulting Agreement, which is a valid, binding contract.

409.  ABIC performed its obligations under the Consulting Agreement or was excused from doing so.

410.  Moore breached the Consulting Agreement through the conduct alleged herein.

411.  As a result of Moore's breaches of the Consulting Agreement, ABIC has been damaged in an amount to be determined at trial.

412.  Pursuant to the Consulting Agreement's Attorney's Fees provision, ABIC is entitled to its attorney's fees and costs in having to bring this lawsuit against Moore.

413. Moore has acted in bad faith, was stubbornly litigious, and caused ABIC unnecessary trouble and expense with respect to the performance of the Consulting Agreement, and ABIC is separately entitled to recover its attorneys' fees and costs from Moore pursuant to O.C.G.A. § 13-6-11.

## COUNT VIII
### Breach of Contract Against Defendant Moore by ABIC (the Confidentiality Agreement)

414. The Company repeats, realleges, and incorporates by reference paragraphs 1 through 270 of this Complaint as is fully restated herein.

415. ABIC and Moore are parties to the Confidentiality Agreement (which protects AFAS's successors and assigns), which is a valid, binding contract.

416. ABIC performed its obligations under the Confidentiality Agreement or was excused from doing so.

417. Moore breached the Confidentiality Agreement through the conduct alleged herein.

418. As a result of Moore's breaches of the Confidentiality Agreement, Plaintiffs have been damaged in an amount to be determined at trial.

419. Pursuant to the Confidentiality Agreement's Attorney's Fees provision, ABIC is entitled to its attorney's fees and costs in having to bring this lawsuit against Moore.

420. Further, ABIC is entitled to injunctive relief given the loss of goodwill

and other irreparable harm occasioned by Moore's breaches of the Confidentiality Agreement.

421. Moore has acted in bad faith, was stubbornly litigious, and caused ABIC unnecessary trouble and expense with respect to the performance of the Confidentiality Agreement, and ABIC is separately entitled to recover its attorneys' fees and costs from Moore pursuant to O.C.G.A. § 13-6-11.

## COUNT IX
## Fraud Against All Defendants

422. The Company repeats, realleges, and incorporates by reference paragraphs 1 through 270 of this Complaint as if fully restated herein.

423. Through their actions described above, Absher, Moore, and Jackson made false representations or omissions of material facts to Assurant and its employees regarding, among other things, their need for highly confidential documents and information belonging to the Company, their interests in and work for CDSG, their affiliation with the CDSG Conspiracy, and their theft, use, and disclosure of the Company's highly confidential information for the benefit of themselves and the CDSG Conspiracy.

424. Absher, Moore, and Jackson made the above-described false representations or omissions of material facts with scienter.

425. Through their actions described above, Ferguson, Absher, and CDSG conspired with, participated in, and aided and abetted the frauds committed by

98

Moore and Jackson, including but not limited to providing an ownership interest in CDSG to Moore; plotting with and/or inducing Absher, Moore, and Jackson to take highly confidential documents and information from the Company for the CDSG Conspiracy's use and benefit; plotting with and/or inducing Moore and Jackson to continue receiving compensation for their services when they were, in fact, working for CDSG in direct competition with the Company; inducing Moore to take the Company's Atlanta Braves tickets for the CDSG Conspiracy's use; and inducing Moore and Jackson to use subterfuge and outright lies to gain access to and steal the Company's highly confidential documents and information for the benefit of the CDSG Conspiracy. The foregoing list is not exhaustive.

426.   Ferguson and CDSG participated in, encouraged, planned, and aided and abetted the above-described false representations or omissions of material facts with scienter.

427.   Absher's, Moore's, Jackson's, Ferguson's, and CDSG's misrepresentations, omissions, and fraudulent concealment, direct or indirect, were knowing and intentional.

428.   Plaintiffs justifiably relied on Absher's, Moore's, Jackson's, Ferguson's, and CDSG's direct or indirect material misrepresentations, omissions of material facts, and fraudulent concealment.

429.   As a result of Absher's, Moore's, Jackson's, Ferguson's, and CDSG's

direct or indirect material misrepresentations, omissions of material facts, and fraudulent concealment, Plaintiffs have been damaged in an amount to be determined at trial.

430.   As a result of Ferguson's and CDSG's participation in, direction of, and coordination of Absher's, Moore's, and Jackson's material misrepresentations, omissions of material facts, and fraudulent concealment as part of the CDSG Conspiracy, Plaintiffs have been damaged in an amount to be determined at trial.

431.   Ferguson's, CDSG's, Moore's, and Jackson's actions showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which raises the presumption of conscious indifference to consequences.  As such, Plaintiffs are entitled to an award of punitive damages against Defendants.

432.   Ferguson, CDSG, Moore, and Jackson acted in bad faith, were stubbornly litigious, and caused Plaintiffs unnecessary trouble and expense, and Plaintiffs are separately entitled to recover their attorneys' fees and costs from Defendants pursuant to O.C.G.A. § 13-6-11.

## <u>COUNT X</u>
**Civil Conspiracy to Commit Fraud and Tortiously Interfere with Plaintiffs'
Contractual and Business Relationships Against All Defendants**

433.   The Company repeats, realleges, and incorporates by reference paragraphs 1 through 270 of this Complaint as if fully restated herein.

434.   As described above, Defendants combined and conspired with Absher

to accomplish unlawful ends, including, but not limited to, participating in, directing, approving, ratifying, or accepting the benefits of numerous false statements of material fact, omissions of material facts, and other fraudulent concealment undertaken to steal documents, information, money, Atlanta Braves tickets, and other Company property for the CDSG Conspiracy's use in, among other things, diverting the Company's dealer clients' business from the Company to CDSG.

435. Defendants, acting in concert, engaged in the misconduct alleged herein, which constitutes the tort of fraud.

436. Defendants Ferguson and CDSG also combined and conspired to accomplish unlawful ends, including but not limited to tortiously interfering with the Company's contracts and business relationships with its dealer clients, tortiously interfering with the Company's contracts and business relationships with the Company's employees and consultants (Moore, Absher, and Jackson), and aiding and abetting Absher's and Jackson's breach of their fiduciary duties.

437. Ferguson and CDSG, acting in concert, engaged in the misconduct alleged herein, which constitutes the torts of interference with contractual or business relations and aiding and abetting breaches of fiduciary duty.

## **COUNT XI**
### **Attorneys' Fees Pursuant to O.C.G.A. § 13-6-11 (All Defendants)**

438. The Company repeats, realleges, and incorporates by reference paragraphs 1 through 270 of this Complaint as if fully restated herein.

101

439.   Through their conduct described above, Defendants have acted in bad faith, have been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense with the meaning of O.C.G.A. § 13-6-11.

## COUNT XII
### Punitive Damages (All Defendants)

440.   The Company repeats, realleges, and incorporates by reference paragraphs 1 through 270 of this Complaint as if fully restated herein.

441.   Defendants acted with the specific intent to cause harm to Plaintiffs when undertaking the tortious conduct described above.

442.   Defendants' actions constitute willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which would raise the presumption of conscious indifference to consequences.

443.   Plaintiffs are entitled to an award of punitive damages against Defendants in an amount to be determined at trial.

## COUNT XIII
### Injunctive Relief (All Defendants)

444.   The Company repeats, realleges, and incorporates by reference paragraphs 1 through 270 of this Complaint as if fully restated herein.

445.   As described herein, the numerous violations of law and contract committed by each of the Defendants has caused and will cause the Company irreparable and immediate injury, loss, and damage, for which it has no adequate

102

remedy at law.

446.   Unless Defendants are enjoined and restrained, there is a substantial threat that the violations of law and contract as stated herein will continue, causing further irreparable injury to the Company.

447.   There is a substantial likelihood that the Company will prevail on the merits of the contractual claims in the dispute, given that the various confidentiality and other restrictions contained in the agreements applicable to Ferguson, Moore, and Jackson are reasonable and necessary to protect the Company's legitimate business interests.

448.   There is also a substantial likelihood that the Company will prevail on the merits of its tort claims, given Defendants actions described herein, which were taken in furtherance of the CDSG Conspiracy's larger scheme.

449.   The threatened harm to the Company without an injunction prohibiting Defendants from committing further breaches of their respective contractual agreements and applicable laws far outweighs any potential harm to Defendants if they are enjoined.

450.   Enjoining Defendants from further breaching their respective contractual agreements and committing further tortious or criminal acts will not be adverse to the public interest.

451.   The Company requests that the Court enter a permanent injunction

against Defendants to restrain and enjoin them from taking any other action that would violate the restrictive covenants contained in their respective contractual agreements or misappropriating the Company's trade secrets.

## DEMAND FOR JURY TRIAL

The Company demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Company requests that the Court enter an Order:

A.    Granting Plaintiffs a jury trial on all triable issues;

B.    Requiring Defendants to return all property in their possession that was stolen from Plaintiffs, including but not limited to Plaintiffs' highly confidential documents and information, money, and any other property they took from Plaintiffs pursuant to O.C.G.A. § 16-14-6(a)(1);

C.    Forbidding Defendants Ferguson, Moore, and Jackson from participating in CDSG's business, either directly or indirectly through agents, entities, or strawmen pursuant to O.C.G.A. § 16-14-6(a)(2);

D.    Revoking CDSG's certificate authorizing it to conduct business within the State of Georgia under O.C.G.A. § 16-14-6(a)(5) and/or dissolving CDSG pursuant to O.C.G.A. § 16-14-6(a)(3);

E.      Revoking any professional licenses held by Absher, Ferguson, Moore, and Jackson in the State of Georgia that relate to or were used in to carry out their conspiracy pursuant to O.C.G.A. § 16-14-6(a)(4);

F.      Dissolving the CDSG Conspiracy pursuant to O.C.G.A. § 16-14-6(a)(3);

G.      Awarding compensatory damages to ABIC and AFAS in an amount to be determined at the trial of this matter;

H.      Awarding punitive damages to ABIC and AFAS in an amount to be determined at the trial of this matter;

I.      Awarding treble damages to ABIC and AFAS in an amount to be determined at the trial of this matter;

J.      Awarding exemplary damages to ABIC and AFAS in an amount to be determined at the trial of this matter;

K.      Awarding ABIC and AFAS their attorneys' fees and costs, including expert fees;

L.      For permanent injunctive relief against Defendants barring Defendants from further use or disclosure of ABIC's confidential and trade secret information;

M.      For permanent injunctive relief against Defendants barring

Defendants from soliciting, contacting, or communicating with, for business purposes, any of the customers identified in the information that Defendants stole for a period of two years;

N.      For permanent injunctive relief against Defendants barring Defendants from unfairly competing with the Company;

O.      Awarding Plaintiffs pre- and post-judgment interest; and

P.      Awarding any such other and further relief as the Court deems proper.

Respectfully submitted, this 17th day of July, 2025.

/s/ *Nathan D. Chapman*
Nathan D. Chapman
Georgia Bar No. 244954
C. Celeste Creswell
Georgia Bar No. 196077
Shawna M. Miller
Georgia Bar No. 202310
Robert G. Wright
Georgia Bar No. 704281
KABAT CHAPMAN & OZMER LLP
171 17th Street NW
Suite 1550
Atlanta, Georgia 30363
Tel: (404) 400-7303
Fax: (404) 400-7333
nchapman@kcozlaw.com
ccreswell@kcozlaw.com
smiller@kcozlaw.com
rwright@kcozlaw.com

*Attorneys for Plaintiffs American Bankers Insurance Company of Florida and American Financial & Automotive Services, Inc.*